William HARLAN, individually and as
parent and natural guardian of Dan-
ielle Harlan, a minor; Genice Harlan,
individually and as parent and natural
guardian of Danielle Harlan, a minor,
Plaintiffs–Appellees,

v.

James S. LEWIS, M.D., Defendant–
Appellant,

Calvin J. Hall, Appellant,

C.E. Ransom, Jr., M.D., Movant.

William HARLAN, individually and as
parent and natural guardian of Dan-
ielle Harlan, a minor; Genice Harlan,
individually and as parent and natural
guardian of Danielle Harlan, a minor,
Plaintiffs–Appellants,

v.

James S. LEWIS, M.D., Defendant–
Appellee,

Calvin J. Hall, Appellee,

C.E. Ransom, Jr., Doctor, Movant.

Nos. 92–1428, 92–1489.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 16, 1992.

Decided Jan. 12, 1993.

Rehearing Denied Feb. 26, 1993.

Rehearing En Banc Denied in No.
92–1428 Feb. 26, 1993.

James M. Moody, Little Rock, AR, argued (Troy A. Price, Calvin J. Hall, and Laura Hensley Smith, on brief), for appellant.

Charles Phillip Boyd, Jr., Little Rock, AR, argued, for appellee.

Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BEAM, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

James S. Lewis, M.D., and his lawyer, Calvin J. Hall, appeal from an order of the district court imposing sanctions on Hall for improper and unethical conduct in ex parte conversations with two treating physician witnesses. The district court[1] sanctioned Hall $2,500 for each of the two conversations. 141 F.R.D. 107. On appeal, Hall argues that the district court erred in imposing sanctions without a finding of bad faith, in attempting to enforce the Model Rules of Professional Conduct outside of state disciplinary proceedings, and in depriving him of property without due process of law. Lewis argues that the district court erred in interpreting Arkansas Rule of Evidence 503 to prohibit witness interviews between defense counsel and treating physicians, and in using this interpretation to justify the sanctions against Hall. We affirm the order of the district court.

This controversy arises from a medical malpractice case brought against Dr. Lewis by the family of Danielle Harlan. Dr. Lewis was the pediatrician who treated Danielle Harlan during the first few months of her life. The Harlans sued Lewis for allegedly failing to check the results of a mandatory blood test for hypothyroidism. The Harlans allege that the delay in detecting and treating Danielle's hypothyroidism caused her significant injury. Danielle was later treated by several other physicians, none of whom are defendants here or are accused by the Harlans of being responsible for any harm to Danielle.

In the discovery process, the Harlans learned that Lewis' defense counsel, Hall, had talked to two of Danielle's treating physicians, Dr. Edward L. McAdams and Dr. James E. Golleher. The Harlans claimed that these conversations were unauthorized ex parte communications in violation of Federal Rule of Evidence 501 and Arkansas Rule of Evidence 503(d). The Harlans filed a motion requesting sanctions, recovery of costs, and prohibition of

further ex parte contact between Hall and the treating physicians.

The district court issued a memorandum opinion and order granting the Harlans' motion on January 29, 1992. The order began:

> The Court is troubled by the lack of civility among attorneys which has become all too common. The erosion of cooperation and courtesy within the legal community accounts, in large part, for the negative image attorneys suffer in the community at large.

The district court then analyzed two specific instances of misconduct by Hall.

The first instance arose from a conversation between Hall and Dr. McAdams. The Harlans submitted an affidavit containing the following statement by Dr. McAdams, which the district court quoted in its order:

> C.J. Hall [Dr. Lewis' attorney] came up and met with me in Searcy, Arkansas. He told me that as a treating physician, I may be called as a witness at the trial of this matter or *could also be sued by the Harlans.*
>
> *Mr. Hall also told me that if I did not testify for the Harlans, that the suit would probably not be successful.*

The district court held that by suggesting to Dr. McAdams that he not testify, Hall had violated the Model Rules of Professional Conduct, which prevent a lawyer from obstructing another party's access to evidence or from counseling a third party to conceal information having possible evidentiary value. *See* Model Rules of Professional Conduct Rule 3.4(a) (1983). The court went on to state that even if Arkansas law permitted such ex parte interviews, this conduct would be impermissible and unethical. The district court then sanctioned Hall $2,500 for this conduct.

The court next turned to a conversation between Hall and Dr. James Golleher, who supervised the laboratory in which Danielle's blood was tested. The district court

---

**1.** The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas.

quoted the following passage from Golleher's deposition:

> Q (by plaintiffs' attorney): And during that conversation [with Mr. Hall], you told Mr. Hall that I had requested to speak to you informally and you had no objection to that. You told him that, didn't you?
>
> A: Yes.
>
> Q: And *Mr. Hall at that time indicated that he did have an objection to you [sic] speaking to me informally,* didn't he?
>
> A: If I remember right.

The district court then referred to Model Rule 3.4(f), prohibiting a lawyer from requesting that "a person other than a client ... refrain from voluntarily giving relevant information to another party." Model Rules of Professional Conduct Rule 3.4(f) (1983). The district court concluded that Dr. Golleher was not Mr. Hall's client, and that Hall's suggestion that Dr. Golleher not speak to Harlan's counsel was unethical. The court sanctioned Hall $2,500 for this conduct.

The district court made clear that the sanctions were intended as a "shot across the bow," and that it considered the monetary sanctions "modest." It noted that Hall had recently designated the treating physicians as "defense experts." The district court seriously considered barring the testimony of these treating physician/defense experts in light of Hall's attempts to influence their testimony. The court, however, rejected this harsh step because it would have "effectively eviscerate[d] Dr. Lewis's ability to present a defense."

The district court ordered other remedial measures. The court prohibited defense counsel from meeting with treating physician experts outside the presence of plaintiffs' counsel, unless the plaintiffs so authorized. Plaintiffs' counsel was specifically permitted to cross-examine these doctors about Hall's attempts to improperly influence their opinions. Finally, if the physicians were to be used as witnesses, defense counsel would be required to turn over to plaintiffs' counsel all notes, record transcripts, and recordings of the ex parte interviews which occurred after the effective date of the 1991 amendments to Arkansas Rule of Evidence 503.

 In deciding to impose sanctions and in creating remedial measures, the court discussed in some detail the physician-patient privilege under Arkansas law. In federal courts, state law governs questions involving privilege. *See* Fed.R.Evid. 501. Rule 503 of the Arkansas Rules of Evidence [2] and Rule 35 of the Arkansas Rules of Civil Procedure [3] have similar provisions stating that a party shall not be required to authorize any communication with his physician or psychotherapist other than the furnishing of medical records or communication in the context of formal discovery procedures.

The district court concluded that even though the privilege was partially waived

---

**2.** Rule 503(d)(3) provides as follows:

... There is no privilege under this rule as to medical records or communications relevant to an issue of the physical, mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense ...; provided, however, a patient shall not be required, by order of court or otherwise, to authorize any communication with any physician or psychotherapist other than (A) the furnishing of medical records, and (B) communications in the context of formal discovery procedures....

**3.** Rule 35(c) provides as follows:

**Medical Records.** Where a party relies upon his physical, mental or emotional condition as an element of his claim or defense, he shall, upon the request of any other party, execute an authorization to allow such other party to obtain copies of his medical records; provided, however, a party shall not be required, by order of court or otherwise, to authorize any communication with his physician or psychotherapist other than (1) the furnishing of medical records, and (2) communications in the context of formal discovery procedures.... The district court continued, citing the reporter's note to the Rule:

[Subdivision (c)] makes plain that a *party may not be required to allow* an adversary to communicate with the party's physician or psychotherapist outside the formal discovery process. *This safeguard is deemed necessary to protect the confidential relationship between a party and his physician* or psychotherapist.

through the filing of a lawsuit, the Harlans retained some control over the manner in which the information concerning their medical records and treatment might be released.

The district court's interpretation of Arkansas Rule of Evidence 503 is closely related both to its imposition of sanctions on Hall and to the other restraints placed on defense counsel in its order. On appeal, Hall and Lewis argue against the district court's reading of Rule 503. Hall also argues that the district judge erred in imposing sanctions.

## I.

■ Hall first argues that the district court erred in imposing sanctions without making an explicit finding of bad faith. Hall further contends that there is no factual basis for either an explicit or implied finding of bad faith. We review all aspects of the imposition of sanctions under an abuse of discretion standard. *See Chambers v. NASCO, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2123, 2138, 115 L.Ed.2d 27 (1991) (citing *Link v. Wabash R.R. Co.,* 370 U.S. 626, 633, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962), and *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990)).

■ The district court sanctioned Hall for two separate actions: Hall's conversation with Dr. McAdams, and Hall's conversation with Dr. Golleher. The district court found that these actions violated two rules: Model Rule 3.4(f) (prohibiting lawyers from asking non-clients to refrain from giving relevant information to other parties), and Arkansas Rule of Evidence 503 (interpreted by the district court as prohibiting all ex parte contact with plaintiff's physicians). The district court also stated that even if its interpretation of Rule 503 was in error and ex parte contact were permissible, Hall's conduct would still be impermissible and unethical. We will discuss the district judge's interpretation of Rule 503 later, but regardless of that interpretation's validity, Model Rule 3.4(f) independently supports the sanctions.

The district court reviewed the record before it and focused on excerpts from Dr. McAdams' affidavit and Dr. Golleher's deposition testimony quoted above. Though Hall quibbles about the subjective understanding of Drs. McAdams and Golleher, he does not deny that these conversations occurred. The district court found that during each conversation Hall attempted to dissuade the doctor from giving testimony or otherwise cooperating with the Harlans. While there may be reasonable alternative interpretations of the conversations, the district court did not abuse its discretion in concluding that Hall had attempted to convince witnesses to refrain from "voluntarily giving relevant information" to the Harlans.

The district court proceeded, under its inherent power, to sanction Hall for both violations of the Model Rule. Both parties now appear to agree that the district court was required to find bad faith prior to imposing sanctions. Hall argues that the finding must be explicit, while the Harlans argue that the finding need only be implicit. We first consider whether the district court must make a finding of bad faith before imposing sanctions pursuant to its inherent power.

The existence in the federal courts of an inherent power "necessary to the exercise of all others" is firmly established. *See United States v. Hudson,* 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812). While this inherent power "ought to be exercised with great caution," it includes the power to discipline attorneys appearing before the court. *See Ex parte Burr,* 22 U.S. (9 Wheat.) 529, 531, 6 L.Ed. 152 (1824). Over the years, the Supreme Court has found inherent power to include the ability to dismiss actions, assess attorneys' fees, and to impose monetary or other sanctions appropriate "for conduct which abuses the judicial process." *Chambers,* —— U.S. at ——, 111 S.Ct. at 2133. The imposition of monetary sanctions against Hall in this case clearly falls within the district court's inherent power.

Hall relies on *Chambers* and *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1979), to support his contention that an explicit finding of bad faith is required. Both *Roadway* and *Chambers*, however, discuss the narrow requirement that a district court assessing attorneys' fees against a party or its counsel find that the party had "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y.*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975).

Although *Roadway* ends with a statement that a finding of bad faith "would have to precede any sanction under the court's inherent powers," the entire opinion discusses only the assessing of attorneys' fees. *Roadway*, 447 U.S. at 767, 100 S.Ct. at 2465. We do not believe *Roadway* extends the "bad faith" requirement to every possible disciplinary exercise of the court's inherent power, especially because such an extension would apply the requirement to even the most routine exercises of the inherent power. *See, e.g., Anderson v. Dunn*, 19 U.S. (6 Wheat) 529, 5 L.Ed. 242 (1821) (discussing the power to "impose silence, respect, and decorum"). We find no statement in *Roadway, Chambers,* or any other decision cited by the parties,[4] that the Supreme Court intended this "bad faith" requirement to limit the application of monetary sanctions under the inherent power.

Moreover, even if we assume that a finding of bad faith is required, we conclude that the district court's order implies a finding of bad faith.

The district court first stated that the undisputed facts illustrated Hall's misconduct. In reference to Hall's conversation with Dr. McAdams, the district court concluded that the conduct violated both the

Model Rules and the Arkansas Rules of Evidence, and that the conduct was "impermissible and unethical" even if it did not violate these rules. The district court came to a similar conclusion with regard to Hall's conduct in his conversation with Dr. Golleher. Although the district judge did not use the actual words "bad faith," his order contained explicit statements of far greater severity.

Reading the order as a whole, it is evident that the district judge saw in Hall's conduct an intentional effort to obstruct the proper flow of relevant information in the discovery process. Although the district judge did not use the words "oppressive, vexatious, or bad faith" to describe Hall's action, and doing so would have more easily disposed of Hall's present argument, the specific findings of impermissible and unethical conduct are sufficient to supply these meanings. Little is to be gained from requiring semantic improvement when the meaning of the district judge is clear. *See Baker Ind., Inc. v. Cerberus, Ltd.*, 764 F.2d 204, 209 (3d Cir. 1985).

## II.

■ Hall next argues that the district court abused its discretion by imposing sanctions instead of referring Hall's conduct to state disciplinary authorities. Hall asserts that "[t]he business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice [before it] *unless the questioned behavior taints the trial of the cause before it*". Appellant's Brief at 17 (quoting *United States v. Dennis*, 843 F.2d 652, 657 (2d.Cir.1988)). Hall also argues that *"[w]here there is no threat to the integrity of further proceedings*, possible ethical violations which 'surfac[e] during the litigation are generally better addressed by the

---

4. Hall cites *Zambrano v. City of Tustin*, 885 F.2d 1473 (9th Cir.1989). While the *Zambrano* decision contains some language supporting a general extension of the bad faith requirement, the court is specifically reviewing a district court's imposition of sanctions in the form of attorneys' fees, jury fees, and court expenses. *Id.* at 1475. The *Zambrano* case is also distinguishable by its

extraordinary facts: The district court, in response to rather minor offenses (counsel's failing to stand while making objections and failing to file a formal application for admission to the district's bar), apparently threatened to have offending counsel shackled in leg irons and removed from the courtroom. *Id.*

comprehensive machinery of the state and federal bar.' " *Id.* (quoting *Armstrong v. McAlpin,* 625 F.2d 433, 444 (2d Cir.1980) (en banc), *vacated on other grounds and remanded,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981)).

We entertain no doubt that the district judge was authorized to preserve the integrity of the proceedings before him by imposing sanctions. The questioned behavior tainted the trial of the cause and threatened the integrity of further proceedings. The district judge saw Hall's misconduct as having a significant negative effect on both the discovery process and the eventual trial. A district judge must have the power to deal with conduct of attorneys in litigation without delegating this responsibility to state disciplinary mechanisms. State disciplinary authorities may act in such cases if they choose, but this does not limit the power or responsibility of the district court. In addition, the state disciplinary body could not have repaired the damage Hall caused by attempting to restrict the flow of relevant information and discovery and by planting implied threats in the minds of potential witnesses. Under these circumstances, the district court was correct in resolving both the disciplinary and remedial questions in a single action.

■ Harlan has cross-appealed arguing for a more potent sanction, such as striking the defendants' answer or precluding the witnesses improperly contacted from testifying. The district court did not abuse its discretion in its careful assessment of the nature of the sanction to be imposed.

### III.

■ Finally, Hall argues that he was sanctioned by the district court without due process of law. The sole issue is whether Hall had notice that the court was considering sanctions against him. Hall contends that the Harlans' motion seeking sanctions was not sufficiently specific to put him on notice. He also argues that Dr. McAdams' affidavit, in which the conversation between Hall and McAdams is described, was not before the court until after Hall responded to the Harlans' motion. After re-

viewing the record, we conclude that the district court provided due process in imposing sanctions.

A brief review of the procedural history of the sanctions is in order here. On November 13, 1991, the Harlans filed a pleading captioned: "MOTION TO PROHIBIT EX PARTE COMMUNICATIONS and COMMUNICATIONS WITHOUT AUTHORIZATION, TO RECOVER UNNECESSARY COSTS INCURRED BY PLAINTIFF'S COUNSEL DUE TO THE ACTIONS OF DEFENSE COUNSEL, AND SCHEDULING ORDER." In this motion, the Harlans requested, among other things, that the court strike the defendant's answer in this case and assess attorneys' fees and other expenses against the defendants. The Harlans also requested "any other relief deemed necessary and equitable by this Honorable Court." The Harlans also filed a brief and a substantial set of exhibits documenting Hall's ex parte communications with various treating physicians (including Drs. Golleher and McAdams). The motion clearly indicates that the Harlans were seeking sanctions for Hall's conversations with the treating physicians.

On December 6, 1991, Hall filed a response to the motion, which acknowledged that "[p]laintiffs are pursuing sanctions in the case at bar on the basis that conversations have taken place."

On December 17, 1991, the Harlans replied and attached Dr. McAdams' affidavit, which the district court cited in its order. The conversation between McAdams and Hall was documented in an exhibit submitted with the Harlans' original motion. The district court issued its memorandum opinion and order on January 29, 1992.

Hall's argument turns on whether the December 6 motion provided Hall with adequate notice that the court would be considering sanctions against him. Striking an answer is the most severe sanction available to a court by virtue of its inherent power, as it would lead to entry of an adverse judgment. Likewise, an assessment of attorneys' fees can impose a se-

vere penalty. By comparison, the monetary sanctions levelled against Hall are relatively mild. The December 6 motion provided Hall with clear notice that the court would be considering the imposition of the most severe sanctions against the defendants on the basis of Hall's personal conduct. If, as he now suggests, Hall possessed additional evidence which would have placed the Golleher and McAdams conversations in context, he had every opportunity, and perhaps an ethical duty, to present them in his client's defense.

Even if we accept Hall's argument that the alleged conversations were not fully before the court until the McAdams affidavit was filed in connection with the Harlans' December 17 reply, forty calendar days elapsed before the court entered its order. During that time Hall could have requested a hearing, submitted additional evidence, or alerted the court to any relevant information regarding the disputed conversations. He did none of these things.

Hall relies on our decision in *Jensen v. Federal Land Bank*, 882 F.2d 340 (8th Cir.1989). The facts of *Jensen* are distinguishable. In *Jensen*, a bankruptcy judge sanctioned an attorney immediately after observing that attorney's noncompliance with a court order (requiring the attorney to present an amended version of a plan). *Id.* at 340–41. There was no real notice of any kind in *Jensen*, and the attorney had no opportunity at all to argue against the imposition of sanctions. *Id.* at 341–42. Conversely, Hall had notice in the December 6 pleading and at least forty calendar days to respond before the district court acted. The present case resembles *Lepucki v. Van Wormer*, 765 F.2d 86 (7th Cir.), *cert. denied*, 474 U.S. 827, 106 S.Ct. 86, 88 L.Ed.2d 71 (1985), in which the Seventh Circuit held that an attorney who did not have explicit notice that the court was considering imposing costs and fees against him nevertheless had sufficient notice because he knew that the court was considering generally the imposition of penalties. *Id.* at 88.

■ Finally, beyond the issue of adequate notice, the district court fully complied with due process. A court must exercise its inherent powers with restraint and discretion, and a primary aspect of that discretion is the ability to fashion an appropriate sanction. *See Chambers,* —— U.S. at ——, 111 S.Ct. at 2132–33. Here, the district judge did not rush into an ill-considered imposition of sanctions. Despite the Harlans' request, the district judge rejected the most severe sanction available under the court's inherent power. He also considered less severe sanctions (i.e., requiring Hall to write a letter of apology). Finally, he considered the effect that various sanctions might have on the course of the litigation and the ability of the parties, especially the defendants, to present their case. In the end, the district judge decided upon a narrowly tailored solution which sanctioned the individual responsible, attempted to remedy the damage caused by the misconduct, and preserved as far as possible the rights of all parties.

We conclude that the district court did not offend due process in its imposition of sanctions against Hall.

### IV.

■ Lewis argues on appeal that the district court erred in interpreting Ark.R. of Evid. 503(d)(3) as prohibiting all informal ex parte contact with treating physicians absent an authorization by the patient. The district court made this determination as one component of its order authorizing sanctions against Hall, and restricting any further ex parte contact between defense attorneys and treating physicians in this case. Lewis argues that Rule 503(d)(3) merely prohibits forcing a patient to authorize ex parte contact with his or her treating physicians. The Harlans argue in favor of a broader protection; namely, that ex parte, informal contact between defense counsel and treating physicians in a malpractice action is impermissible without authorization from the plaintiff, and that Rule 503(d)(3) simply makes it explicit that a plaintiff cannot be forced to authorize

such contact.[5] The district judge substantially adopted the Harlans' view. More recently, Judge Waters of the Western District of Arkansas adopted the interpretation proposed by Lewis. *See King v. Ahrens*, 798 F.Supp. 1371 (W.D.Ark.1992), *appeal filed*, No. 92–2997 (8th Cir. Sept. 8, 1992).

The language giving rise to these rival interpretations was added to Rule 503 by amendment on May 13, 1991. The Arkansas Supreme Court has acknowledged the existence of this question, but it has never directly ruled on the proper interpretation of the 1991 amendment. *See Duncan v. Cole*, 302 Ark. 60, 786 S.W.2d 587 (1990). The duty of the district court in the absence of decisions from Arkansas courts interpreting the 1991 amendment was to determine the state supreme court's probable interpretation. *See Anderson v. Employers Ins. of Wausau*, 826 F.2d 777, 779 (8th Cir.1987).

In the case before us, the district court first reviewed the general history of the physician-patient privilege, and then analyzed the Arkansas statutory physician-patient privilege. In interpreting the 1991 amendments to Rule 503, the district court examined the corresponding 1991 amendments to Rule 35 of the Arkansas Rules of Civil Procedure. Finally, the district court reviewed the relevant public policy considerations and decisions from other jurisdictions.

We are bound to review de novo the district court's state law determination, giving its decision no deference. *See Salve Regina College v. Russell*, —— U.S. ——, ——, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). We believe that the district court's interpretation of Rule 503(d)(3) is consistent with other Arkansas Rules of Evidence and existing state law. First, the

Arkansas statutory physician-patient privilege resides with the patient, and not with the physician. *See* Rule 503(b). Second, only the holder of the privilege has the capacity to waive that privilege by voluntary disclosure. *See* Ark.R. of Evid. 510. Finally, a claim of privilege is not defeated by "a disclosure which was … made without *opportunity to claim the privilege.*" Ark.R.Evid. 511 (emphasis added).

The 1991 amendments to Rule 503 and Rule 35 of the Arkansas Rules of Civil Procedure define privilege,[6] limit its application, require authorization for disclosure where the condition is an element in a claim or defense, and, as the district court observed, regulate the manner in which information concerning medical treatment is released.

The district court opinion, the briefs of the parties, and the opinion in *King v. Ahrens* all raise questions relating to the scope and nature of physician-patient privilege. We need not explore these issues in detail, because we believe that the issue before us concerns not the scope of the privilege but the manner of disclosure required under the Arkansas rules.

Both Rule 503(d)(3) and Arkansas Rule of Civil Procedure 35 provide that a party may not be required by order of court or otherwise to authorize "any communication" with his physician other than the furnishing of medical records and communications in the context of formal discovery procedures. "Any communication" is an inclusive term. Where the rule specifically prescribes the manner of disclosure to which a patient must consent, we cannot read·the plain language of the rules to permit disclosure in ex parte interviews. The strict requirements of consent are antithetical to the authorization of non-consen-

---

**5.** Of course, a plaintiff in a malpractice action is required to authorize the release of relevant medical records and formal discovery by defense counsel. *See* Ark.R. of Evid. 503(d)(3); Ark.R.Civ.P. 35.

**6.** The scope of the physician-patient privilege in Arkansas law has evolved over the years. The original privilege, created by Arkansas Statute § 28–607 (1947), covered all information a phy-

sician had about a patient. Rule 503 replaced this statute and limited the privilege to confidential communications between the patient and doctor. *See Baker v. State of Arkansas*, 276 Ark. 193, 637 S.W.2d 522, 524–25 (1982). The 1991 amendment defined privilege to cover medical records or confidential communications made for the purpose of diagnosis or treatment. *See* Rule 503(b).

sual ex parte interviews. Furthermore, when the Arkansas Supreme Court adopted the 1991 version of these rules, it also adopted an amendment to the Reporter's Note accompanying Arkansas Rule of Civil Procedure 35 which states:

New subdivision (c) of this rule sets out the circumstances under which a party must authorize release of his medical records to another party. It also makes plain that a party may not be required to allow an adversary to communicate with the party's physician or psychotherapist outside the formal discovery process. This safeguard is deemed necessary to protect the confidential relationship between a party and his physician or psychotherapist.

Underscoring the limitation on communication outside the discovery process and the confidential relationship between patient and physician is fully consistent with the language of the Arkansas rules. The district court did not err in determining that the rules prohibited non-consensual ex parte communications with the treating physicians. The district court's ruling is not only appropriate, but indeed is required if careful attention is given to the notion of consent embodied in the rules.

Another consideration enters our analysis: Rule 503(d)(3) removes the privilege only from communications or records concerning a condition that is an element of a claim or defense; information not relating to such a condition is still privileged. If the rules did not strictly prescribe the manner in which treating physicians could disclose information, it would be left to the treating physician to determine what information was subject to disclosure and what information remained privileged. Requiring that contact with treating physicians occur only within the context of formal discovery relieves the treating physician of this responsibility, protects any still privileged information that the physician might possess, and provides for the orderly disclosure of information relating to the condition that is an element of the claim or defense. We reject the arguments of Hall and Lewis that ex parte interviews are authorized generally by discovery rules, or that the filing of the suit operates as an absolute waiver of the privilege. The carefully crafted Arkansas rules are simply to the contrary.

The district court relied on the discussion in *Crist v. Moffett*, 326 N.C. 326, 389 S.E.2d 41 (1990). *Crist* differentiated issues of privilege from issues concerning the manner in which information may be obtained from a plaintiff's treating physician. *Id.* 389 S.E.2d at 45–46. *Crist* pointed to the confidential nature of the physician patient relationship which it held to be separate and distinct from the statutory privilege. Thus, even when the privilege was waived, the confidential nature of the physician-patient relationship justified control over the release of information. *Id.* at 46–47. *Crist* concluded that formal discovery provided the most effective means of enabling opposing parties to reach relevant information while simultaneously protecting the patient's privacy. *Id.* The presence of counsel and the possibility of judicial intervention helped to insure these results. Formal discovery also protects the treating physician from liability arising from improper disclosure of information in an ex parte conference. *Id.* The reasoning in *Crist* persuades us, as it did the district court.

We realize that our decision on the state law question is our prediction of what the Supreme Court of Arkansas will decide, and it is evident that when that court reaches these issues its decision will be the ultimate authority.

Finally, during oral argument, Lewis' counsel asserted that affirming the district court would allow malpractice plaintiffs to use Rule 503 to interfere in the relationship between defense counsel and a malpractice defendant. We reject this argument. When a doctor is a party to the action, four different considerations apply: (1) the party doctor has a right to be represented by counsel; (2) this right is meaningless without the ability to converse freely with counsel about the representation; (3) when the issue is malpractice, the party physician must be able to consult with counsel about the treatment at issue and this entails dis-

closure of the details of that treatment; and (4) the law of privilege applying to medical witnesses should not render the party physician powerless to prepare a defense. Arkansas case law reenforces our belief that the Rule 503(d)(3) language is intended to apply only to treating physicians, other than the defendant physician, who may be called to testify in the case. *See, e.g., Duncan v. Cole,* 786 S.W.2d at 587; *Goodwin v. Harrison,* 300 Ark. 474, 780 S.W.2d 518 (1989).

We affirm the order of the district court.

BEAM, Circuit Judge, concurring specially.

I concur in Parts I, II, and III of the court's opinion and in the imposition of sanctions. I also concur in the affirmance of the district court's interpretation of Arkansas Rule of Evidence 503 as set forth in Part IV of the opinion, but only insofar as the district court ruling affects the issue raised by Dr. Lewis on appeal.

Our opinion notes that Judge H. Franklin Waters, United States District Judge for the Western District of Arkansas, has now construed Rule 503(d)(3) in accordance with the argument advanced by appellant Hall. Were we writing on a clean slate in this appeal, I would lean toward Judge Waters's analysis. We are not so writing, of course, because of the proceedings already undertaken in the district court and because of Judge Woods's analysis of the privilege.

I believe that Judge Woods's interpretation is tenable, and one that will permit discovery and trial in this litigation to proceed without great injustice. Accordingly, I register my limited concurrence in the affirmance. I hope, however, that the Arkansas Supreme Court will find it appropriate to settle this important issue in the near future.

The court's opinion correctly points out that Judge Woods based his sanction order, in part, on his interpretation (and, presumably, Hall's purported misinterpretation) of Rule 503(d)(3). This was error. While I support the order of sanctions on other grounds, the order should not have been bottomed in any way upon a dispute as to what Rule 503(d)(3) permits or precludes.

As shown by the good faith disagreement between eminent Judges of the Eastern and Western Districts of Arkansas, it is evident that Hall's interpretation is also tenable. In my view, then, it is wrong for a sanction to have been imposed on the basis of the privilege. If a lawyer is subject to sanctions simply because he has disagreed with a judge over the reading of a rule of evidence or procedure, the unwarranted chilling effect upon the adversarial process is obvious.