954 N.E.2d 217 (2010)
352 Ill. Dec. 357
Luis SAN ROMÁN and Miguel San Román, Plaintiffs-Appellants,
v.
CHILDREN'S HEART CENTER, LTD., d/b/a Rush Children's Heart Center, and Carlos E. Ruiz, M.D., Defendants-Appellees.
No. 1-09-1217.
Appellate Court of Illinois, First District, Sixth Division.
Opinion filed December 23, 2010.
Modified upon denial of rehearing June 30, 2011.
*218 Keith A. Hebeisen, Brian S. Shallcross, Clifford Law Offices, P.C., Chicago (Robert P. Sheridan, of counsel), for Plaintiffs-Appellants.
James K. Horstman, Michael D. Huber, Cray Huber Horstman Heil & VanAusdal LLC, Chicago, for Defendants-Appellees.
Justice McBRIDE delivered the judgment of the court, with opinion.
¶ 1 In this medical malpractice action, the plaintiff minor patient and his father appeal from an adverse judgment, arguing a subsequent treating physician should not have been allowed to testify for the defendant physician and that jury instructions improperly referred to the standard of care of a well-qualified "pediatric interventional cardiologist," which is not a board-certified medical speciality. They also contend the judgment is contrary to the manifest weight of the evidence or, in the alternative, the cumulative effect of the two errors was so prejudicial that the trial was not fair.
¶ 2 The following facts are disclosed by the record on appeal. Plaintiff Luis San Román was born in 1986 in Madrid, Spain, with cyanosishe was a "blue baby" suffering from a heart condition which deprived his body of oxygen and is known as transposition of the aorta or transposition of the great arteries. In a normal heart, oxygen-poor blood returns from the body to the right atrium, travels to the right ventricle, is pumped through the pulmonary artery into the lungs, where it picks up oxygen, and oxygen-rich blood travels from the lungs to the left atrium, into the left ventricle, and is pumped through the aorta out to the body. In Luis' heart, however, two, nearly separate circulations formed in which oxygen-poor blood flowed from the right atrium directly to the aorta where it returned to the body, and oxygen-rich blood flowed from the left atrium right back to the lungs. He also, however, suffered from stenosis (narrowing) of the pulmonary artery, and introducing a Blalock-Taussig shunt within weeks of his birth facilitated a weak but normal exchange of blood through his heart. The blood flow was made more efficient by Rastelli surgery when Luis was five, in which a donor artery was used to connect his right ventricle to his pulmonary artery and an artificial baffle and homograft (donor tissue) were inserted to connect his left ventricle to his aorta. It was anticipated that Luis would outgrow the baffle and would need further surgery. This was Luis' situation by the time he was 13, when *219 the San Román family was residing in Barcelona, Spain.
¶ 3 On June 22, 1999, in an attempt to delay open heart surgery, defendant Chicago surgeon Carlos E. Ruiz, M.D., who was then employed by defendant Children's Heart Center, Ltd., at Rush-Presbyterian-St. Luke's Medical Center, used a heart catheterization process to insert a stent in Luis' left ventricle. The procedure was not successful, Luis' mitral valve was torn during the attempt, he went into heart failure, and he suffered a series of strokes (which are a known risk in any cardiac procedure). He underwent open heart surgery and spent about a month in the hospital. Examinations by a cardiologist and a neurologist five weeks later indicated Luis was emotionally traumatized by his experience and that long-term physical concerns included vision abnormalities and potential cognitive deficits.
¶ 4 In 2001, Luis and his father Miguel sued Ruiz and Ruiz's employer, contending the doctor recommended and performed the catheterization without informing the San Román family it was experimental and very risky and that open heart surgery would have been the better choice. In their second amended complaint, filed after Luis turned 18, he sought damages for medical negligence and his father sought damages pursuant to the statute commonly known as the family expense act. 750 ILCS 65/15 (West 2000).
¶ 5 On August 28, 2001, Ruiz's defense attorney retained physician James E. Lock, M.D. of Children's Hospital Boston and forwarded unspecified documents for his review. In June 2003, a Chicago surgeon who began treating Luis after the failed catheterization referred Luis to Lock as the more experienced practitioner. Without informing the San Román family that he was assisting the defense attorney, Lock performed a catheterization procedure on the teenage boy in July 2003. The San Román family updated their attorney about Luis' care, the attorney relayed this information to the defense attorney, and the defense attorney contacted Lock on August 21, 2003, to confirm that he had treated or was treating Luis. On August 25, 2003, Lock verbally confirmed to defense counsel that he performed the procedure on Luis in July 2003. After this confirmation, Lock continued to assist the defense but neither he nor defense counsel advised the San Román family or their attorney of the relationship.
¶ 6 Instead, on September 12, 2003, Ruiz filed a motion for protective order seeking the defense attorney's "right to continue to use Dr. James Lock as his retained consultant as has been the case for the two years before `treating physician' status occurred."[1] Ruiz indicated Lock's established role was "to consult on and review this matter and provide his expert opinion regarding the treatment given to [Luis]." Ruiz argued that "if a plaintiff's later occurring physician-patient relationship arrangement could be held to preclude defendant's previously established consulting relationship with a retained expert, plaintiffs would always establish such a relationship to defeat defendant's ability to communicate with its retained experts." Accordingly, the defense attorney wanted "to communicate with Dr. James Lock outside the confines of formal discovery procedures with the exception of matters related to his care and treatment of [Luis] which [the attorney assured the judge] would be conducted only pursuant to * * * Supreme Court Rule 201." Ruiz concluded *220 with a request for "a protective order allowing the defendant's counsel to communicate with Dr. James Lock pursuant to the authorized methods of discovery outlined by Supreme Court Rule 201." Within a week, on September 19, 2003, the defense attorney drafted and presented an agreed order for the judge's entry without a hearing. The meaning of this order is currently in dispute:
"AGREED ORDER

This matter coming to be heard on defendant CARLOS RUIZ, M.D.'s Motion for Protective Order, due notice having been given and the court being advised in the premises, it is hereby agreed by the parties and ordered as follows:
1. [The motion] * * * is granted. Defendant DR. RUIZ (and his attorneys and representatives) may continue to retain, consult with and communicate with his retained consulting pediatric cardiology expert Dr. James Lock as to any and all matters relating to the care and treatment of the plaintiff LUIS SAN ROMÁN rendered by DR. RUIZ and others at Rush-Presbyterian-St. Luke's Medical Center and any and all medical conditions, alleged injuries and damages flowing therefrom before the care and treatment rendered by Dr. James Lock or others at Boston Children's Hospital to the plaintiff LUIS SAN ROMÁN.
2. Nothing in this order authorizes defense counsel or representatives of defendant CARLOS RUIZ, M.D. to obtain medical records or information through means other than formal discovery * * *."
¶ 7 Although lawyers on both sides of the case were now aware of Lock's dual relationship, the San Román family was not when Lock rendered "some brief follow-up [to Luis] in 2004."
¶ 8 Luis celebrated his eighteenth birthday on June 1, 2004.
¶ 9 The San Románs' attorney deposed Lock in late July 2005 and learned that he had never disclosed to the family or their referring physicians that he was helping Ruiz's attorney. Up until that point, the San Románs' attorney believed his clients had been advised of Lock's dual role.
¶ 10 On November 17, 2005, the San Románs filed a motion to bar Ruiz and his attorneys from any further ex parte communication with Lock and to bar Lock from testifying for the defense, on grounds that the physician-patient relationship created a duty of confidentiality, and to compel production of all communications which had occurred, so Luis could determine if his confidences had been breached. The Children's Heart Center and Ruiz filed separate responses to the motion to bar and compel, in which they argued defense counsel had not knowingly communicated with Luis' treating physician in violation of Petrillo v. Syntex Laboratories, Inc., 148 Ill.App.3d 581, 102 Ill.Dec. 172, 499 N.E.2d 952 (1986), and that the San Románs waived a Petrillo objection by entering into the agreed order. In a written order entered on January 18, 2006, the trial judge denied the motion, reasoning that parties act through their lawyers, and in this case, the lawyers agreed to the order entered on September 19, 2003, which "granted defendant Dr. Ruiz the right to continue to utilize Dr. Lock as his retained expert." The judge rejected for lack of evidence the suggestion that Lock deliberately and dishonestly withheld from the San Románs that he had become an expert for the defendants and that the San Románs would have acted differently if told. The judge also remarked upon the gap between the agreement and the motion to bar and compel, and found the San Románs had delayed in bringing the motion *221 and waived their objection. A motion for reconsideration provided the judge with affidavits from Luis, his father Miguel, and his grandfather Pedro Gomendio, who was the most conversant in English and had been involved in Luis' medical care, including the family's presurgical conference with Ruiz in Chicago in 1999. The three gentlemen swore that Lock failed to inform them of his association with the defense, and if they had been so informed in July 2003, they would have immediately terminated the relationship with Lock and contacted their attorneys. The judge denied the motion on March 21, 2006, emphasizing the agreement between counsel and concluding that "as this case is nearing its end" it is too late to complain and "[p]laintiffs have waived their rights under Petrillo." The San Románs petitioned the Illinois Supreme Court for a supervisory order regarding Lock's association with and testimony for the defense, but the supreme court denied the request.
¶ 11 On March 16, 2007, in compliance with the rules regarding pretrial discovery, Ruiz tendered his witness list indicating Lock would testify both as an independent expert witness pursuant to Rule 213(f)(2) in his capacity as Luis' treating physician and as a controlled expert witness pursuant to Rule 213(f)(2) opining on Ruiz's treatment of Luis. 210 Ill.2d R. 213(f).
¶ 12 A year and a half after that, a jury trial commenced on August 1, 2008, and ended in a verdict for Ruiz and the Children's Heart Center on August 15, 2008. The San Románs' posttrial motion was denied in a written order dated April 23, 2009.
¶ 13 The San Románs' main argument on appeal is that Lock should not have been allowed to testify as a defense witness. They contend the trial judge erroneously denied this aspect of the motion to bar and compel, because the judge misconstrued the nature of the parties' underlying agreed order. The family contends it is quite apparent the agreed order provided only for Lock to continue as Ruiz's "consulting" expert regarding the treatment rendered at Children's Heart Center and did not in any way contemplate that Lock would later testify at trial adverse to his own patient. The family contends their claims were doomed once Lock took the stand against Luis and that the strong prejudicial effect of his testimony warrants a new trial.
¶ 14 The San Románs cite Petrillo, a lawsuit about defective infant formula, which they acknowledge is factually distinguishable. Petrillo, 148 Ill.App.3d 581, 102 Ill.Dec. 172, 499 N.E.2d 952. In that case, defense counsel intentionally circumvented the conventional methods of discovery outlined in Supreme Court Rule 201, such as an oral deposition, written interrogatories, and document requests (166 Ill.2d R. 201), and pursued private, ex parte conferences with the plaintiff's treating physicians, insisting this was a proper, cost-effective, and necessary way to obtain their true opinions. Petrillo, 148 Ill. App.3d at 584, 102 Ill.Dec. 172, 499 N.E.2d at 954. In the current case, since no one is suggesting defense counsel had improper contact with Luis' treating physician, Petrillo's specific holding is distinguishable. However, the court's rationale for prohibiting ex parte contact without prior consent is pertinent. The court emphasized that the patient and society have an expectation of confidentiality which is reflected in the Hippocratic Oath, which speaks of "`secre[cy],'" the ethics principles of the American Medical Association which obligate a physician to "`safeguard patient confidences,'" and opinions of the association's ethics and judicial panel which insist that patient disclosures are to be kept "`confidential to the greatest possible *222 degree.'" Petrillo, 148 Ill.App.3d at 589, 102 Ill.Dec. 172, 499 N.E.2d at 957-58. The profession's guidelines, in fact, "dictate that the physician owes his patient an obligation of honesty as well as confidentiality." (Emphasis in original.) Petrillo, 148 Ill.App.3d at 589, 102 Ill.Dec. 172, 499 N.E.2d at 958. The court also found guidance in case law indicating that a special relationship forms between a doctor and patient. It is well-settled in Illinois and other jurisdictions that a fiduciary relationship arises between doctor and patient. Petrillo, 148 Ill.App.3d at 594, 102 Ill.Dec. 172, 499 N.E.2d at 961; T. Boyd, Cost Containment and the Physician's Fiduciary Duty to the Patient, 39 D.P.L.L.R. 131, 135 (Fall 1989) ("No authority may seriously dispute that physicians owe a fiduciary duty to their patients"). A fiduciary is "duty bound to act with the utmost good faith for the benefit of the other [party]." Abbott v. Church, 288 Ill. 91, 97, 123 N.E. 306, 308 (1919); Petrillo, 148 Ill.App.3d at 594, 102 Ill.Dec. 172, 499 N.E.2d at 961. "Essentially, this means that a physician must place the interests and well-being of the patient above his or her own interest." T. Boyd, Cost Containment and the Physician's Fiduciary Duty to the Patient, 39 D.P.L.L.R. 131, 135-36 (Fall 1989). The physician is expected to always "deal honestly with his patient and thereby avoid engaging in conduct that undermines the fiducial nature of the relationship." Petrillo, 148 Ill.App.3d at 594, 102 Ill.Dec. 172, 499 N.E.2d at 961.
¶ 15 Petrillo relied in part on Alexander, which involved a two-car collision and a jury award which the trial court overturned as "calloused" and "palpably inadequate." Alexander v. Knight, 197 Pa.Super. 79, 177 A.2d 142, 147 (1962) (per curiam); Petrillo, 148 Ill.App.3d at 595, 102 Ill.Dec. 172, 499 N.E.2d at 961. One of the problems the court identified was that a treating physician wrote a report for the defense indicating his patient's recovery "`should be very good'" but was impeded by preexisting emotional problems. Alexander, 177 A.2d at 145. The doctor never told his patient that he was assisting the other driver and accepted a fee that was the equivalent of 10 doctor's office visits. Alexander, 177 A.2d at 146 (stating physician's fee for five office visits and physician's fee for writing report). He testified at trial that he wrote the report and, with the plaintiff's own doctor seemingly against her, the defense attorney then "very ably" portrayed the plaintiff to the jury as an "emotionally disturbed woman who * * * exaggerated her complaints [and] permitted her emotional instability to prolong her illness." Alexander, 177 A.2d at 147. The court found this characterization inappropriate, stating, "An emotionally ill person does not `permit' [prolonged] * * * illness; such illness is real not feigned." Alexander, 197 Pa.Super. 79, 177 A.2d at 147. Although the doctor's report was not the most "significant" error that occurred, the court expressed its displeasure with him and with the doctor that helped the defense solicit reports from the plaintiffs' treaters:
"We are of the opinion that members of * * * the medical profession, stand in a confidential or fiduciary capacity as to their patients. They owe their patients more than just medical care for which payment is exacted; there is a duty of total care; that includes and comprehends a duty to aid the patient in litigation, to render reports when necessary and to attend court when needed. That further includes a duty to refuse affirmative assistance to the patient's antagonist in litigation. The doctor, of course, owes a duty to conscience to speak the truth; he need, however, speak only at the proper time. Dr. Ezickson's *223 role in [soliciting the report and] inducing Dr. Murtagh's breach of his confidential relationship to his own patient is to be and is condemned." Alexander, 197 Pa.Super. 79, 177 A.2d at 146.
¶ 16 Petrillo also cited Miles, a medical malpractice action in which the court held that a doctor who treated the plaintiff both before and after being retained as one of the defendant's expert witnesses had breached the duties of loyalty, confidentiality, and affirmative disclosure that he owed to his patient. Petrillo, 148 Ill. App.3d at 595, 102 Ill.Dec. 172, 499 N.E.2d at 961; Miles v. Farrell, 549 F.Supp. 82, 84-85 (N.D.Ill.1982). Even if the dual relationship began inadvertently, the doctor "had a clear conflict of interest which he had an obligation to disclose to his patient." Miles, 549 F.Supp. at 84. Allowing the doctor to subsequently take the witness stand for the defense was untenable, and in the court's opinion, "the mere fact that he takes the stand as an expert employed by the defendant assures that his position is adverse to that of his patient." Miles, 549 F.Supp. at 85.
¶ 17 Thus, Petrillo concluded that ex parte communications between a plaintiff's treating physician and defense counsel "are prohibited as against public policy because they jeopardize the sanctity of the confidential and fiducial physician-patient relationship." (Emphasis in original.) Mondelli v. Checker Taxi Co., 197 Ill. App.3d 258, 261, 143 Ill.Dec. 331, 554 N.E.2d 266, 270 (1990) (discussing extent of the Petrillo doctrine). The patient "should have the right to expect that his physician will provide the medical information sought by the patient's adversary pursuant only to court authorized methods of discovery." (Emphasis omitted.) Petrillo, 148 Ill.App.3d at 595, 102 Ill.Dec. 172, 499 N.E.2d at 961. Discussion of the patient's confidences under circumstances other than through formal discovery is prohibited because it "could be inconsistent with the duties of a fiduciary" and is "potentially harmful to the interests of the patient in that the physician might disclose intimate facts of the patient which are unrelated and irrelevant to the mental or physical issue placed at issue in the lawsuit." (Emphasis added.) Petrillo, 148 Ill.App.3d at 595, 102 Ill.Dec. 172, 499 N.E.2d at 962. "A plaintiff should be allowed to protect his physician-patient privilege before it is compromised." (Emphasis in original.) Mondelli, 197 Ill.App.3d at 261, 143 Ill. Dec. 331, 554 N.E.2d at 270.
¶ 18 A physician should not be in the position of deciding what patient information is subject to disclosure and what information remains privileged. Roosevelt Hotel Ltd. Partnership v. Sweeney, 394 N.W.2d 353, 357 (Iowa 1986); Harlan v. Lewis, 982 F.2d 1255, 1264 (8th Cir.1993). A medical professional is not trained to make that determination. Roosevelt Hotel, 394 N.W.2d at 357 ("Asking the physician, untrained in the law, to assume this burden is a greater gamble and is unfair to the physician"). Limiting contact to formal discovery relieves the doctor of this responsibility and protects the patient's interests. Roosevelt Hotel, 394 N.W.2d at 357; Harlan, 982 F.2d at 1264.
¶ 19 Consistent with this reasoning, in Mondelli, the court held that even a treating physician's office partner was barred from ex parte communication with the defense attorney. Mondelli, 197 Ill.App.3d at 261-67, 143 Ill.Dec. 331, 554 N.E.2d at 270-73 (applying the "physician-patient privilege rule enunciated in Petrillo").
¶ 20 The San Románs cite this line of authority for the proposition that Lock allowed a conflict of interest to arise, violated the duties of confidentiality and loyalty he owed to Luis, and should have been *224 barred from taking the witness stand as an expert against his own patient. Acknowledging that Ruiz and his attorneys probably did not knowingly violate the Petrillo doctrine, the San Románs point out how improbable it is that the Boston doctor did not realize his teenage Spanish patient with subaortic stenosis was the same teenage Spanish patient with subaortic stenosis who was suing Ruiz. The defense benefitted from Lock's intentional wrongdoing, while Luis and Miguel were prejudiced. If Lock had been barred, the defense would have suffered the inconvenience of finding a new expert, but the public policy behind Petrillo would have been honored.
¶ 21 Ruiz responds that Petrillo can be distinguished as a case in which the plaintiffs did not consent to their physicians talking to the defense attorneys, and the plaintiffs here clearly consented to Lock talking to and working as a paid expert on behalf of the defense. Ruiz contends the judge properly enforced the terms of the agreed order and the San Románs have offered no evidence to support "the special meaning" they ascribe to the order's terms. He also contends the family demonstrated a lack of fairness and diligence in bringing the motion to bar and compel and had no right to insist that Lock be barred from the defense team. Rather than filing a separate brief, the children's heart center filed a motion to join and adopt its employee's brief as its own, and we granted the motion.
¶ 22 We agree that the San Románs, through their attorney, consented to Lock's association with the defense team; however, the argument misses the point. Ruiz's motion for a protective order and the subsequent agreed order repeatedly refer to Lock as a consultant, and in the Illinois courts, a litigation consultant is an expert who works entirely behind the scenes and never testifies at trial. Ruiz's motion referred to Illinois Supreme Court Rule 201, which addresses the methods and permissible scope of discovery. Subparagraph (b)(3) of that rule provides the following definition:
"Consultant. A consultant is a person who has been retained or specially employed in anticipation of litigation or preparation for trial but who is not to be called at trial. The identity, opinions, and work product of a consultant are discoverable only upon a showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts and opinions on the same subject matter by other means." 166 Ill.2d R. 201.
The Committee Comments to Rule 201 explain that "`exceptional circumstances'" warranting discovery of an adversary's consultant might occur when that person "is the only source of information about [an item of physical evidence that is no longer available because of destructive testing], or in cases in which all the experts in a field have been retained by other parties and it is not possible for the party seeking discovery to obtain his or her own expert." 166 Ill.2d R. 201, Committee Comments, at lviii. Even outside the legal field, the term "consultant" is commonly understood to mean "a person who gives professional or expert advice." Webster's Unabridged Dictionary 437 (2d ed.1998). Thus, a physician retained as a "consultant" would be in an advisory role and would help the attorney understand the terminology and nuances of the claim, decipher treatment records, prepare to depose medical professionals, and otherwise ready the case for trial. The "consultant" would remain invisible to the opposing attorney, his or her client, and the judge, except in "exceptional circumstances" warranting disclosure (166 Ill.2d R. 201); and the jury would have no reason to ever know the "consultant" existed.
*225 ¶ 23 Furthermore, this jurisdiction has historically distinguished between experts who testify at trial and consulting experts who do not testify at trial. Former Rule 220 preceded the current version of Rule 201 and provided the following "[d]efinition of expert witness":
"An expert is a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation who may be expected to render an opinion within his expertise at trial. He may be an employee of a party, a party, or an independent contractor." (Emphasis added.) 134 Ill.2d R. 220.
In contrast, the rule defined a "Consulting expert" as "a person who possesses the same qualifications as an expert witness and who has been retained or specially employed in anticipation of litigation or preparation for trial but who is not to be called at trial to render opinions within his area of expertise." (Emphasis added.) 134 Ill.2d R. 220. The Committee Comments to former Rule 220 elaborated:
"[This discovery rule] recognizes the difference between an expert who is to testify at trial and one who is retained to advise the parties without expressing an opinion under oath. The latter is a resource person whose retention is often essential to an appreciation of the technical aspects of a claim. The former is retained to testify, as well as consult * * *. Both possess expertise in a specialized area beyond that of an average person." 134 Ill.2d R. 220, Committee Comments, at 180.
Similarly, Rule 26(b)(4), the federal counterpart of our former Rule 220, does not use the term "consultant" but does distinguish between "an expert whose opinions may be presented at trial" and "an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." Fed. Rs. Civ. Proc. 26(b)(4)(A), (b)(4)(B) (West 2004).
¶ 24 During the discovery phase of this lawsuit, Ruiz's attorney presented a motion for protective order which tracked the language of the discovery rules by introducing Lock as "his retained consultant," stating Lock had been hired "to consult on and review this matter and provide his expert opinion regarding [Luis'] treatment," and arguing that the later-formed doctor-patient relationship between Lock and Luis should not "preclude defendant's previously established consulting relationship with a retained expert." Continuing, the motion sought authorization for defense counsel "to communicate with Dr. James Lock outside the confines of formal discovery procedures with the exception of matters related to his care and treatment of [Luis] which would be conducted only pursuant to [the conventional methods of discovery described in] Supreme Court Rule 201." Thus, the motion spoke of the need for limited communication between defense counsel and Lock, but did not indicate Lock would be part of the trial presentation.
¶ 25 The motion was resolved by an agreed order, also drafted by defense counsel, which authorized counsel to "continue to retain, consult with and communicate with his retained consulting pediatric cardiology expert [about any and all aspects of Luis' care and treatment, medical conditions, injuries, and damages occurring before he came under Lock's care in 2003]." (Emphasis added.) The order's concluding sentence is an additional indication that the subject at hand was discovery, not trial, stating "2. Nothing in this order authorizes defense counsel or representatives *226 of defendant CARLOS RUIZ, M.D. to obtain medical records or information through means other than formal discovery * * *."
¶ 26 It appears that at the time, no one, not even defense counsel, anticipated calling Lock to testify before the judge or jury. Ruiz's choice of words limited Lock's role to an advisory capacity. An agreed order is not a judicial determination of the parties' rights, it is a recitation of an agreement between the parties which is subject to the rules of contract interpretation (Kandalepas v. Economou, 269 Ill. App.3d 245, 252, 206 Ill.Dec. 538, 645 N.E.2d 543, 548 (1994)), and we cannot find any indication in this agreed order that Lock would take the stand as a defense expert witness. The parties did not agree that Lock could testify against his own patient. Ruiz protests the San Románs have "offered no evidence to support the special meaning that they ascribe to the Agreed Order," yet it is Ruiz who has expanded the agreement beyond the plain terms that were chosen by his lawyer. The agreed order clearly authorized Lock to communicate with defense counsel and, therefore, precluded a Petrillo objection, but it did not authorize Lock to also take the witness stand in Ruiz's defense. The agreed order did not support the court's denial of the San Románs request to bar Lock from testifying at trial.
¶ 27 Ruiz and Children's Heart Center complain that the distinction between a consulting expert and a testifying expert is one the San Románs never made in the trial court and that raising the objection for the first time on appeal results in waiver. See Webber v. Wight & Co., 368 Ill.App.3d 1007, 1019, 306 Ill.Dec. 782, 858 N.E.2d 579, 591 (2006). We do not find waiver. First, the plaintiffs persistently maintained in their motion to bar (denied January 18, 2006), motion for reconsideration (denied March 21, 2006), and petition for supervisory order (denied June 7, 2006) that it was improper for Lock to testify at trial. Second, the San Románs' posttrial motion did draw the distinction between a consulting expert and a testifying expert which Ruiz is contending is an invention of the San Románs' appellate brief writer. In denying the motion for a new trial, the judge summarized this particular argument but did not address it, ruling instead that the San Románs "agreed to allow Dr. Ruiz to continue to utilize Dr. Lock as his retained expert," "knew that Dr. Lock was the defendants' expert and that he would be giving opinions concerning this case when they agreed to the September 19th Order," and "waived their rights under Petrillo by failing to assert their rights in a timely fashion and by specifically agreeing to allow Dr. Lock to remain as Dr. Ruiz's expert while still treating [Luis]." In our opinion, the judge accurately concluded that the San Románs consented to and waived a Petrillo objection, but had no basis for also concluding they consented to and waived objection to their physician's appearance as a defense expert witness. The plaintiffs are entitled to a new trial which does not include Lock as a defense expert witness.
¶ 28 Given this conclusion, we need not reach Luis' additional grounds for reversal. We reverse the judgment entered for the defense and remand this cause for a new trial consistent with the opinions expressed above.
¶ 29 After this decision was issued, Ruiz filed a petition for rehearing which misstates our conclusions. Children's Heart Center filed a motion to join and adopt Ruiz's petition in its entirety, and we granted this request. Ruiz challenges our conclusion that the motion for protective order and agreed order which his attorney drafted spoke of the discovery phase only *227 and gave no indication that the parties were thinking ahead to the trial itself. Ruiz also argues unpersuasively that we found Lock guilty of an ethics violation.
¶ 30 As detailed above, the two documents drafted by the defense referred to Luis' new treating physician as a defense consultant, cited a discovery rule, and indicated defense counsel wanted to "communicate" with the physician on certain topics but would otherwise adhere to the "confines of formal discovery procedures." Because the documents address discovery onlya preliminary phase of the litigation process that does not encompass trialwe remarked, "It appears, that at the time, no one, not even defense counsel, anticipated calling Lock to testify before the judge or jury." (Emphasis added.) Ruiz misquotes this sentence, so that it reads, "It appears, that at no time, no one, not even defense counsel, anticipated calling Lock to testify before the judge or jury." (Emphasis added.) Ruiz contends, "That statement is untrue and there is nothing in the record to support the assertion." He further contends, "The truth is that defense counsel always expected that Dr. Lock would testify." The agreed order speaks for itself and we would not presume to know defense counsel's intentions during the seven years it took to bring this case to trial. We concluded that two documents which defense counsel drafted during the discovery phase address the discovery phase only and should not have been construed as an agreement about the eventual trial. The Petrillo line of authority describes the significance of a doctor giving "affirmative assistance to the patient's antagonist in litigation," and, in our opinion, if the parties had agreed Lock would be affirmatively assisting Ruiz at trial despite his new doctor-patient relationship with Luis, the agreed order would have and should have spelled this out. Alexander, 197 Pa.Super. 79, 177 A.2d at 146; Petrillo, 148 Ill. App.3d 581, 102 Ill.Dec. 172, 499 N.E.2d 952. Instead, the agreed order allowed defense counsel to "continue to retain, consult with and communicate with his retained pediatric cardiology expert." To this we add what Luis' attorney said a year afterward, while deposing Lock in his capacity as one of Luis' treaters. The attorney confirmed that Lock's other role was "a consulting expert working on this case" and "a consultant working for [defense attorney] Mr. Huber on this case," which reflects an understanding that Lock was Huber's behind-the-scenes advisor. We stand by our conclusion that the language of the agreed order was not a basis for denying Luis' request to bar Lock from testifying at trial.
¶ 31 What sets this case apart from Petrillo and other authority cited by the parties is that the plaintiff sought follow-up treatment unwittingly from a doctor who had been hired by the defense and the doctor did not inform his new patient that a dual relationship was being formed. Luis was still unaware a year later when he returned for further treatment from the defense expert and remained uninformed for an additional year after that. Lock's nondisclosure to his patient became apparent only when the patient's attorney deposed the doctor in his capacity as a treating physician and thought to address the doctor's unusual alliance with two adversaries by asking, "did you ever discuss with Luis or his family the fact that you were a consultant working for [defense attorney] Mr. Huber on this case?" The plaintiffs' inadvertent choice for follow-up care was an unintended endorsement of the skill and medical expertise of the defense expert. Realizing that this was a significant detail, the defense attorney made sure the jury knew of the relationship by asking Lock, "In addition to being retained as an expert in this case on behalf *228 of Dr. Ruiz, did you have an opportunity to see Luis as a patient?" Only after establishing the extent of Lock's medical training and experience and that he was a well-regarded authority in his field, even by Luis and his father, did the defense attorney elicit Lock's opinion that the defendant treating physician acted within the standard of care. The jury was allowed to surmise that a physician the San Románs respected and trusted disagreed with their lawsuit. Cross-examination about the formation of the relationship would have only served to emphasize that the patient's current doctor was affirmatively opposing his lawsuit against his previous doctor. Lock's testimony was pivotal to the defense because he was the only witness to testify regarding the standard of care.
¶ 32 Our concern has been that because Lock was both Luis' new doctor and a defense expert trial witness, the trial started with the plaintiffs at an unsurmountable disadvantage. The uninformed patient was not permitted to weigh the pros and cons of beginning treatment with a defense expert witness and he did not give informed consent to the formation of a dual relationship. We did not find that Lock's conduct was proper or improper. We cited the Petrillo line of authority only for the proposition that his dual relationship was unusual and contrary to his patient's interests. Ultimately, it is irrelevant to this court how Lock's unusual, dual affiliation came about and it makes no difference whether he deliberately or inadvertently accepted Luis as a new patient. Furthermore, we have not suggested that a patient has the right to stop his treating physician from testifying against him. Treating physicians may give their opinions in depositions, in interrogatories, and from the witness stand. See e.g., Petrillo, 148 Ill. App.3d at 598, 102 Ill.Dec. 172, 499 N.E.2d at 965 (barring ex parte conferences should not be construed as giving a plaintiff a proprietary right in the testimony of his treating physician). The issue presented and addressed in this appeal was whether the trial judge erroneously denied the plaintiffs' motion to bar the second doctor from testifying for the defense at trial on the basis of nonexistent language in the parties' agreed order. We were persuaded that, in an abuse of discretion, the trial judge denied the motion on this ground. We concluded the trial judge abused her discretion when she failed to consider the prejudicial effect of the patient's uninformed choice of doctors for follow-up care. Implicit in our holding was the conclusion that the plaintiffs were manifestly prejudiced by their uninformed choice in follow-up treaters. Accordingly, we reversed the judgment and barred Lock from testifying as a defense witness at a subsequent trial.
¶ 33 The petition for rehearing is denied.
¶ 34 Judgment reversed and cause remanded for a new trial; petition for rehearing denied.
Presiding Justice GARCIA and Justice R. GORDON concurred in the judgment and opinion.
NOTES
[1] Ruiz states the motion in the record on appeal is incorrectly file-stamped with a 2004 date. The San Románs do not dispute this statement and the order which resolved the motion bears a 2003 date. Accordingly, we accept the 2003 date as the correct one.