**Supreme Court**

No. 2013-14-Appeal.
No. 2013-16-Appeal.
(WC 00-63)

Kathryn Manning et al.                    :

v.                               :

Peter J. Bellafiore, M.D., et al.          :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2013-14-Appeal.
No. 2013-16-Appeal.
(WC 00-63)
(Dissent begins on page 26)

Kathryn Manning et al.           :

v.           :

Peter J. Bellafiore, M.D., et al.           :

Present: Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  This case originated as a negligence and wrongful death action brought by Kathryn Manning (Mrs. Manning or plaintiff), individually and as administratrix of the estate of Michael Manning (Manning) and on behalf of her four minor children, against Peter J. Bellafiore, M.D. (Dr. Bellafiore or defendant), but has since evolved into extensive litigation regarding sanctions.[1]  The trial justice sanctioned both Dr. Bellafiore and the law firm that represented him at trial, White & Kelly, P.C. (WCK),[2] for their failure to make pretrial disclosures.  The latter parties each appealed from the order awarding sanctions and the matters were consolidated by this Court.  The overriding issue to be decided in both appeals is whether the trial justice properly imposed sanctions.  For the reasons set forth herein, we affirm in part and reverse in part the judgment of the Superior Court.

---

[1] Although the original complaint also included Donald M. McNiece, M.D., and South County Hospital as defendants, neither is party to this appeal.
[2] White & Kelly, P.C. was formerly known as White, Carlin & Kelly, P.C. or White & Galamaga, P.C, and will be referred to herein, collectively with Attorney William F. White, as WCK.

# I

## Facts and Procedural History

### A

### Overview

This Court is familiar with the facts in this case as set forth in <u>Manning v. Bellafiore</u>, 991 A.2d 399 (R.I. 2010) (<u>Manning I</u>). To briefly summarize, on March 4, 1998, Manning was taken to the emergency care unit at South County Hospital (SCH) after he lost consciousness and fell at his home. Manning was admitted to SCH and, over the course of four days, Dr. Bellafiore was the treating neurologist responsible for Manning's care. During this time, Dr. Bellafiore also consulted with Donald M. McNiece, M.D. (Dr. McNiece), Manning's primary-care physician. Doctor Bellafiore established a differential diagnosis[3] for Manning of complex migraine, aneurysm, tumor, and stroke, and he recommended that Manning undergo a magnetic resonance imaging (MRI)/magnetic resonance angiography (MRA) to determine whether Manning was suffering a stroke and, if so, to locate the blockage of blood flow to his brain.[4]

On the first day he was admitted to SCH (March 4 or day 1), Manning attempted to undergo an MRI/MRA on two occasions. The first attempt was unsuccessful, however, because he had a claustrophobic reaction. Doctor Bellafiore prescribed the antianxiety medication Ativan and the antinausea medication Compazine for Manning, but a second attempt to undergo the MRI/MRA was also unsuccessful. The next day (March 5 or day 2), Dr. Bellafiore contacted the MRI Network of Rhode Island to set up an "open architecture MRI" for Manning in the hope of mitigating Manning's claustrophobia. The MRI Network of Rhode Island directed Dr. Bellafiore

---

[3] Differential diagnosis is a list of considered causes of a given symptom or symptoms.
[4] Doctor Bellafiore also prescribed aspirin as an antiplatelet medication.

to the open MRI machine at Rhode Island Hospital (RIH).  However, Dr. Bellafiore learned that the open MRI machine at RIH was under repair and would not be available.

On March 6 (day 3), a computerized tomography (CT) scan, conducted and ordered by Dr. Bellafiore after Manning complained of a headache, revealed that Manning had indeed suffered a stroke on March 4.  Doctor Bellafiore again attempted to schedule an open MRI at RIH; however, he was informed that the machine was still down for repair but that it would possibly be fixed by the end of the day.  On March 7 (day 4), Dr. Bellafiore spoke with a radiology fellow at RIH, who opined that an open MRI machine would not give as good an image as a closed one.  At that juncture, the decision was made for Manning to try the closed MRI machine under general anesthesia on March 9, the next day the MRI machine would be available at SCH.[5]  Tragically, however, Manning suffered a second stroke on March 7.  He was airlifted to Massachusetts General Hospital, where a blood clot led to steadied loss of brain function.  Manning's life support was withdrawn on March 9 and he passed away.

On January 6, 2000, plaintiff filed a negligence and wrongful death suit against Drs. Bellafiore and McNiece, as well as against SCH.  As the case progressed, an important component of plaintiff's malpractice claim against Dr. Bellafiore was his failure to conduct the MRI during the first three days of Manning's hospitalization and his failure to present Manning with alternatives to obtaining the MRI in light of Manning's claustrophobia.  One of plaintiff's main contentions was that Manning's death could have been avoided if defendants had administered or obtained an MRI test immediately after Manning's admission to the hospital, either at SCH or by transferring him to a different facility.

---

[5] SCH was a participant in the Rhode Island Medical Resonance Imaging Network, which provided hospitals without in-house MRI/MRA machines the use of its portable MRI/MRA machine on certain scheduled days.

# B

## Discovery

The parties engaged in discovery from the commencement of the action in January 2000 to January 2004, when the case went to trial. During discovery, there was a great deal of evidence and testimony relating to Dr. Bellafiore's treatment of Manning. Specifically, the evidence presented focused on Dr. Bellafiore's attempts to have Manning undergo an MRI and discussions regarding sedation to assist him in undergoing the procedure.

In plaintiff's interrogatories, plaintiff asked Dr. Bellafiore to "state to the best of [his] recollection any and all conversations [he] had with any person concerning the care and/or treatment of * * * Manning from March 4, 1998 to date * * *." The plaintiff asked Dr. Bellafiore to provide information regarding "the person with whom [he] had each conversation," "the time and date of each conversation," and "the content of each conversation." (Interrogatory No. 18.) Doctor Bellafiore raised several objections but ultimately directed plaintiff to his answer to interrogatory No. 7 and attested that "[he] spoke with [Manning] and [Mrs. Manning] during [Manning's] admission regarding his treatment," without specifying the content of those conversations. The answer to interrogatory No. 7 also did not specify any conversation Dr. Bellafiore had with Manning, instead, it provided a brief overview of Manning's hospital stay. It does not appear from the record that plaintiff sought to compel more responsive answers to interrogatories No. 7 or 18. However, following Dr. Bellafiore's deposition, plaintiff filed a motion to compel Dr. Bellafiore to file a more responsive answer to plaintiff's interrogatory No. 16, which asked for all facts relating to defendant's assumption of the risk defense. In Dr. Bellafiore's supplemental answer, he averred that in

> "the event that plaintiff asserts that an MRI would have changed
> * * * Manning's outcome in this case, * * * Manning refused to be
> sedated to undergo a 'closed' MRI, when the 'open' MRI at [RIH]

was inoperable, despite being repeatedly informed that he might have a life threatening condition, which might be detectable by MRI."[6]

During his deposition, Dr. Bellafiore was questioned regarding the sequence of events, including his conversations with Manning regarding the MRI and sedation. When asked what he gives to patients experiencing claustrophobia to make them capable of completing an MRI, Dr. Bellafiore replied, "I use Ativan." He further explained that the amount of Ativan is "dependant [sic] on [the patients'] size, their weight but also the effect that the medication has on them." The questioning then proceeded to the situation where sedation equipment was brought into the MRI suite; Dr. Bellafiore testified that he was aware of that possibility, and discussed his experiences. When asked if there was "any reason why * * * Manning couldn't have been sedated with the assistance of anesthesiology on March 4th in order to accomplish the MRI," Dr. Bellafiore answered yes, "[b]ecause it's a dangerous procedure to give someone general anesthesia or anesthetic who is having a potential stroke."

Doctor Bellafiore testified that he had not called the anesthesia department to ask what kind of sedation could be performed on Manning "because it's dangerous or it would put him at risk," which Dr. Bellafiore did not wish to do "unless [they] couldn't get the study in the open [MRI] machine." He was asked what options there were for sedation in a closed machine at RIH, to which he responded that he had assumed they were the same as at SCH: "There are a variety of things you can do including Ativan or other benzodiazepines, there are antipsychotics that they may use, the general things an anesthesiologist would do." At this point, Dr. Bellafiore explained that sedation posed a risk to Manning because "it [could] alter blood pressure,

---

[6] Doctor Bellafiore had, in his original answers to interrogatories in January 2001, indicated that he would supplement his answer to interrogatory No. 16 "as discovery progresse[d]." Although it is unclear whether the trial justice ever issued an order compelling a more responsive answer to that interrogatory, Dr. Bellafiore did file a supplemental answer to interrogatory No. 16.

respiratory function, it also [could] affect the neurologic exam making it difficult to assess the patient for integral changes. It [could] cause them to aspirate, it [could] have technical/mechanical difficulties, all the risks that you [would] have with general anesthesia."

Doctor Bellafiore testified that on day 1 he told the Mannings "that it would be difficult to treat [Manning] unless [they] had [the MRI and MRA] done." He recalled that he asked Manning on day 2 whether Manning would undergo an MRI if he had more sedation. When asked what he told Manning about sedation, Dr. Bellafiore testified that "[he] said [they] could try giving [Manning] more Ativan to make him a little sleepier to see if [Manning] could tolerate the test," however, he testified that Manning "said there was no way that he wanted to try that. He just couldn't do it he said. Those were his words. He just [could not] do it. And he apologized. He felt bad about it but he said he didn't want to try." When asked if it was Dr. Bellafiore's "testimony that [Manning] refused to attempt this test after [he] told [Manning] that he had a life[-]threatening condition * * *," Dr. Bellafiore stated "[a]bsolutely." Doctor Bellafiore also testified that he spoke to Dr. McNiece "[e]ssentially [about] * * * Manning * * * refusing the MRI * * * even with more sedation in the closed machine." When asked if Manning "had undergone sedation [short of general anesthesia] in order to accomplish an MRI, * * * what[] [was] the likelihood that his blood pressure and respiration would become so compromised that it would be life[-]threatening," Dr. Bellafiore replied that he did not know a percentage number, "but [he] would say that the chances are great enough that you would want to attempt the open MRI first." He testified that he told Manning in the evening of day 2 that "[they] would try for the open MRI machine the next day."

Doctor Bellafiore further testified that, after examining Manning in the morning of day 3, he told Manning "that it look[ed] like [he was] having symptoms of a stroke and that [they]

- 6 -

really need[ed] to perform th[e] MRI." Because the open MRI machine at RIH was still not operational that day, "[Dr. Bellafiore] asked [Manning] if he would consider going into the closed unit with more sedation and [Manning] said no." Doctor Bellafiore conceded that he did not document this conversation or Manning's refusal to undergo the closed MRI.

Doctor Bellafiore testified that on the following day, day 4, he spoke to a radiology fellow at RIH again in an attempt to learn the status of the open MRI machine. At that time it became apparent to Dr. Bellafiore that it was unclear when and if the open MRI machine would be working. After Dr. Bellafiore testified that the fellow stated that he did not believe the image in the open MRI would be as good as the closed MRI and that he suggested trying the closed MRI under general anesthesia, the following colloquy occurred during the deposition:

> "Q. Well, didn't you tell him that the closed machine with general anesthesia posed a risk of death to your client, your patient?
> "A. We talked about it.
> "Q. Well, what did he say about that risk of death from sedation or anesthesia?
> "A. Well, I don't remember what he said, but it really didn't matter what he said. The open MRI wasn't available.
> "Q. So how does that change the fact that sedation or anesthesia pose[d] a risk of death to your patient? How does that change it?
> "A. It doesn't change the fact, but if there's no alternative which at this point there wasn't --
> "Q. Uh-huh.
> "A. -- then we had no choice but to try the regular MRI with some anesthesia.
> "Q. So if I understand you correctly, as of March 7th you were prepared to try the closed machine and put * * * Manning under some kind of sedation or anesthesia in order to get a picture, right?
> "A. Correct.
> "Q. Well, why, Doctor, why were you prepared to take that risk on the 7th when you weren't prepared to have * * * -- to take that risk with * * * Manning on the 5th or the 6th?
> "* * *
> "A. Because on the 5th and the 6th the expectation was that the open MRI, which was the safer test, was going to be available. That's the information that was conveyed to us."

Doctor Bellafiore testified that the decision was made to perform the MRI under general anesthesia at SCH on March 9, the next day the machine would be available at the hospital.

## C

## Trial

On January 5, 2004, after a lengthy discovery period, the case proceeded to trial. On the fifteenth day of trial, Dr. Bellafiore testified that on days 2 and 3 of Manning's hospitalization, he offered Manning "conscious sedation" to assist him in undergoing a closed MRI but that Manning apologetically refused. Specifically, Dr. Bellafiore testified that, when his patients experience claustrophobia, "[Ativan] [i]s the first thing that [he] tr[ies]." He further explained that:

> "Well, what I'm telling you is that I did offer him Ativan. And then I also talked to him about IV sedation * * * with the help of an anesthesiologist.
> "* * *
> "I told him about conscious sedation. * * * I've had a number of patients who had seizures who are developmentally delayed * * * [a]nd with those patients sometimes you need to get an MRI. And a good way of doing it, because they're so uncooperative, is to give them this IV Versed, which is that sedative.
>     "So I told him about those patients that I had experience with and told him it was something that we could certainly arrange for or try to do.
> "* * *
> "I remember [what Manning told me], because I was struck by it. He told me, 'I'm sorry, Doc.' I remember it when people call me Doc. It just makes me feel like a doctor. 'I know you need me to do this test to figure out what to do, but I just can't do it.' This was on the morning of the 5th after I told him all the things that could possibly be wrong. And I told him about conscious sedation. I told him about Ativan. I told him the open MRI may not give us the answer we need. I basically held -- and told him he could have a stroke, he could have a tumor. I was holding a neurological gun to his head. That's when he told me, 'I'm sorry, Doc, if you need me to do this, I just can't do it.' I was struck because I never had a patient apologize to me about that before. And frankly, I felt a little guilty because here's a guy who's sick, who's probably

- 8 -

> scared to death, and I'm making him feel so guilty he's apologizing to me.
>
> "At that point I told him, you know, 'Okay. We can try for the open MRI, see what we can get, and we'll go from there.' And I didn't document any of that."

Doctor Bellafiore explained that what he "mean[t] by sedation [was] Ativan or IV Versed, and that's what [he] would refer to as conscious sedation." He also testified that conscious sedation was a "reasonable option" for Manning and that he had discussed it with Manning on the morning of day 2.

Over a week later, plaintiff filed a motion for entry of default judgment against Dr. Bellafiore or in the alternative to strike his defense or testimony for inconsistencies between his discovery disclosures and trial testimony regarding sedation. Doctor Bellafiore objected to both remedies. The trial justice pointed out that Dr. Bellafiore had not yet completed testifying, and reserved his decision "until probably after the verdict." The trial justice stated that:

> "Sometimes the greatest penalty for a witness who has been inconsistent or misleading is that the jury won't believe him or her. Here the witness is still testifying so the [c]ourt declines to step in at this point and will reserve and see what happens. Counsel may submit additional responses for final instructions or for other relief."

After the conclusion of all testimony, plaintiff set forth a renewed motion for entry of default judgment against Dr. Bellafiore. The trial justice denied the motion "without prejudice" but also "treat[ed] it as a motion for judgment as a matter of law" and reserved his decision until after a verdict was reached. The next day, the jury returned a verdict in favor of all three defendants.

### D

### Posttrial Sanction Proceedings

The plaintiff subsequently filed a motion for a new trial. The defendant filed a renewed motion for judgment as a matter of law. The trial justice granted plaintiff's motion for a new

trial as to Dr. Bellafiore on the grounds that the verdict was not supported by the evidence. This Court affirmed the trial justice's grant of a new trial on the basis that the trial justice had not overlooked or misconceived material evidence when deciding that the verdict was against the fair preponderance of the evidence. Manning I, 991 A.2d at 410-11.

Following this Court's decision, plaintiff filed a renewed motion for sanctions against Dr. Bellafiore and his attorneys for their failure to disclose during discovery that he had spoken to Manning on days 2 and 3 of his hospitalization regarding the possibility of using conscious sedation to undergo the MRI. The defendant again objected to the motion. After further briefing and hearings, the trial justice issued an order finding that "an order imposing sanctions upon Dr. Bellafiore or his attorney(s) [was] appropriate" based upon "the actions described in the [c]ourt's [d]ecision of November, 2005." The court also noted that plaintiff had reserved her right to seek additional sanctions for "other conduct." Finding that the type and extent of the sanction to be imposed had not "yet been established," the court reserved on the issue pending further hearing and discovery.

Shortly thereafter, the negligence and wrongful death case against Dr. Bellafiore settled. However, the parties' dismissal stipulation explicitly preserved "the claims being made by * * * plaintiff[] for sanctions against Dr. Bellafiore, William F. White [(White)] or [WCK]." Extensive hearings were held throughout 2011 and 2012 concerning essentially the differences between Dr. Bellafiore's pretrial disclosures and his trial testimony to determine the degree of the sanction to be imposed and upon whom it should be imposed. The trial justice heard testimony by Dr. Bellafiore and the two partners at WCK who represented Dr. Bellafiore at trial—White and Joshua Carlin. Attorney Richard Boren also testified for plaintiff as to the

reasonableness of the amount of plaintiff's sanction request. The parties also submitted post-hearing written memoranda.

During the sanction proceedings, new evidence became available regarding a letter Dr. Bellafiore, with the assistance of counsel, drafted and submitted to the Rhode Island Board of Medical Licensure (board letter). In this board letter, Dr. Bellafiore described in detail his treatment of Manning. The board letter outlined that Manning refused to undergo a closed MRI on day 2 of his hospitalization, even with "maximum sedation." White had the board letter in his files and when tasked with providing answers to plaintiff's interrogatories, Dr. Bellafiore referred counsel to the board letter.

## E

### Superior Court Decision

In a lengthy decision, the trial justice granted plaintiff's motion to sanction both Dr. Bellafiore and WCK under Rule 11 of the Superior Court Rules of Civil Procedure and awarded plaintiff $152,998.57—holding Dr. Bellafiore individually responsible for eighty percent and WCK for the remaining twenty percent. In his decision, the trial justice first analyzed whether the imposition of a sanction was appropriate, and then considered whom to sanction, how to apportion the sanction, and what monetary amount to sanction.

As to the first inquiry concerning the appropriateness of a sanction in this case, the trial justice observed that Dr. Bellafiore's trial testimony was "drastically different" from what was present in the medical records. The trial justice also found that the following information was never provided prior to trial:

> "[(1)] The term 'conscious sedation,' which Dr. Bellafiore seems to use throughout his trial testimony, had not been used before[;]
> "[(2)] Talking to * * * Manning about bringing in an anesthesiologist had never been described[;]
> "[(3)] The drug, Versed, was never identified earlier[;]

- 11 -

"[(4)] Conversations with * * * Manning about sedations on March 5 or March 6 were not mentioned by Dr. Bellafiore earlier[;]

"[(5)] Even more surprising was Dr. Bellafiore's new revelation that * * * Manning apologized ('I'm sorry, Doc.')."

The trial justice explained that the "entire defense changed and different facts were thrown into the mix of an already complex trial" as a result of this testimony. Accordingly, he concluded that a sanction was indeed appropriate.

In deciding whom to sanction, the trial justice found that "Dr. Bellafiore's trial testimony was far more telling than his discovery responses." He concluded that "[e]ither [Dr. Bellafiore] was hiding the complete answers, or he opted to modify his version of the truth far into the trial." He explained that, if the conversation that Dr. Bellafiore testified to at trial had in fact occurred, "Dr. Bellafiore had a clear obligation to disclose that in his discovery answers." He found that Dr. Bellafiore's testimony at the sanction hearing "bore limited credibility," sought to "cast blame on everyone but himself," and was "very self-serving." The trial justice concluded, however, that "Dr. Bellafiore's testimony did not lead the [trial] [c]ourt to surmise that counsel masterminded the entire shell game" and that Dr. Bellafiore "b[ore] significant responsibility for the sanctionable conduct."

The trial justice further explained that "[t]here was no showing that [White] knew that Dr. Bellafiore had such a detailed recollection of the specific events of the key conversation * * *." However, the trial justice highlighted that White had the board letter, which included Manning's refusal to undergo the MRI even with "maximum sedation," and despite Dr. Bellafiore having pointed White to the board letter to properly answer the interrogatories, White "failed to include the reference to maximum sedation in Dr. Bellafiore's interrogatory answers." The trial justice opined that "Dr. Bellafiore and his counsel should have recognized that the issue of sedation, and whether * * * Manning gave informed consent, were very much in issue. They

- 12 -

had a duty to disclose facts, when asked. * * * Counsel knew, or should have known, of this clear obligation." Ultimately, the trial justice concluded that White "was obligated but failed to determine the issues with * * * Manning's anesthesia and * * * Manning's concerns about the anesthesia," and "[w]hile th[e] [c]ourt [wa]s clearly convinced that Dr. Bellafiore b[ore] the lion's share of responsibility for the failure to respond, counsel ha[d] some responsibility as well."

In deciding how to apportion the sanction between Dr. Bellafiore and White, the trial justice reasoned that Dr. Bellafiore was "primarily culpable," since "[h]e responded to his attorneys' questions, drafted interrogatory answers, signed answers under oath, responded to deposition questions under oath, verified the transcripts for their accuracy, and uncorked the surprise testimony deep into the marathon trial." Consequently, he held Dr. Bellafiore eighty percent responsible and WCK twenty percent responsible. The trial justice disagreed with Dr. Bellafiore's argument that the costs incurred by plaintiff should have been reduced by one-third because there were two other defendants in the matter. He explained that "it was the sanctionable conduct rooted in Dr. Bellafiore's defense which caused the need for the second trial—and created the chaos of the first trial." The trial justice did not consider the proposed deduction to be appropriate in view of the fact that the motion for a new trial was granted solely in plaintiff's case against Dr. Bellafiore.

Finally, in deciding what monetary amount would be appropriate as a sanction, the trial justice highlighted that so much of plaintiff's attorneys' efforts, "including the trial itself and some of the preparation costs, were for naught." The trial justice explained that ordering the new trial did nothing to make plaintiff whole, but instead "simply burden[ed] [plaintiff] with more expenses and labor." The trial justice then conducted an analysis to determine the amount of

- 13 -

attorneys' fees that it would be reasonable to assess as a sanction and the proper method of calculating those fees in light of plaintiff's contingency-fee arrangement with her attorneys. The plaintiff's attorneys had not kept contemporaneous time records because they did not bill on an hourly basis; therefore, they were required to retroactively calculate their time and expenses. Ultimately, the trial justice assessed $38,398.53 for "expenses * * * incurred by [plaintiff] and rendered unnecessary as a result of the sanctionable conduct." With respect to attorneys' fees, the trial justice allowed 23 hours for pretrial work "which were rendered useless or redundant as a result of the sanctionable conduct"; 325.5 hours for trial work and 25 hours for the sanction proceedings, for a total of 382 hours at a rate of $300 per hour.[7] Accordingly, the trial justice imposed a sanction totaling $152,998.57. Judgment was entered for plaintiff in that amount, and both Dr. Bellafiore and WCK filed timely notices of appeal. This Court consolidated their appeals.[8]

## II

### Standard of Review

"Like questions of statutory construction, the interpretation of court rules of procedure is a legal question for the court." FIA Card Services, N.A. v. Pichette, 116 A.3d 770, 776 (R.I. 2015) (quoting Rosano v. Mortgage Electronic Registration Systems, Inc., 91 A.3d 336, 339 (R.I. 2014)). "We apply a de novo review to questions of law." Id. Moreover, "[w]hile 'a trial justice has discretionary authority to formulate what he or she considers to be an appropriate

---

[7] Although the trial justice "awarded" plaintiff 25 hours of attorneys' fees for time "dedicated to the sanction proceedings," he appears to have calculated the total sanctions using the figure of 33.5 hours, the amount originally requested by plaintiff. Additionally, despite "awarding" 23 hours for pretrial work and $38,398.53 in trial costs, the trial justice ultimately included 25 hours for pretrial work and $38,398.57 for trial costs in his final calculation.

[8] Additional facts relating to the trial justice's decision will be discussed as they become pertinent to this Court's analysis.

- 14 -

sanction,' we will reverse a sanction when it was imposed based on an erroneous view of the law" or on a clearly erroneous assessment of the evidence. Id. (quoting Pleasant Management LLC v. Carrasco, 918 A.2d 213, 217 (R.I. 2007)). We will reverse a trial justice's decision regarding sanctions if the trial justice has abused his or her discretion or is otherwise clearly wrong. Carrasco, 918 A.2d at 217.

## III

## Discussion

This case presents two issues to be decided by this Court: (1) whether Rule 11 applies to discovery violations; and (2) whether the trial justice abused his discretion or was otherwise clearly wrong in sanctioning Dr. Bellafiore and WCK.

## A

## Applicable Rule

"Rule 11 'provides trial courts with broad authority to impose sanctions against attorneys for advancing claims without proper foundation * * *.'" Huntley v. State, 109 A.3d 869, 873 (R.I. 2015) (quoting Michalopoulos v. C & D Restaurant Inc., 847 A.2d 294, 300 (R.I. 2004)). Rule 11 provides, in pertinent part, as follows:

> "[E]very pleading, written motion, and other paper of a party represented by an attorney shall be personally signed by at least one * * * attorney of record * * *. * * * The signature of an attorney * * * or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry * * * [it] is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that * * * [it] is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. * * * If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own

initiative, may impose upon the person who signed * * * [it], a represented party, or both, any appropriate sanction * * *."

As recently noted in Pichette, 116 A.3d at 779, "the linchpin of Rule 11 is its signature requirement," because the "signature certifies to the court that the signer has made '[a] reasonable inquiry to assure that all pleadings, motions and papers filed with the court are factually well-grounded, legally tenable and not interposed for any improper purpose.'" Id. at 778 (quoting Pleasant Management LLC, 918 A.2d at 218). Under the plain language of Rule 11, sanctions may be imposed "upon the person who signed [the document], a represented party, or both * * *." "In fashioning an appropriate sanction, a trial justice 'must do so in accordance with the articulated purpose of the rule: to deter repetition of the harm, and to remedy the harm caused.'" Huntley, 109 A.3d at 873 (quoting Pleasant Management LLC, 918 A.2d at 217).

Here, the trial justice "abstain[ed] from deciding whether defective interrogatory answers violate[d] Rule 11, Rule 26, or Rule 37 [of the Superior Court Rules of Civil Procedure] * * *," but nonetheless applied Rule 11 sanctions. It is our opinion that in view of its clear language, Rule 11 does not apply to the discovery violations alleged in this case—where it is claimed that defendant failed to provide complete answers to interrogatories and at deposition. See D'Amario v. State, 686 A.2d 82, 85 (R.I. 1996) (holding that sanctions under Rule 11 were inappropriate because, among other things, "Rule 26(f) and not Rule 11 would be the applicable rule for assessing compliance with certification standards" of discovery requests, responses, and objections).

"Nevertheless, we acknowledge that this Court may award attorneys' fees as an exercise of 'its inherent power to fashion an appropriate remedy that would serve the ends of justice.'" Blue Cross & Blue Shield of Rhode Island v. Najarian, 911 A.2d 706, 711 n.5 (R.I. 2006) (quoting Vincent v. Musone, 574 A.2d 1234, 1235 (R.I. 1990)).

"This remedy, however, is available only in one of three narrowly defined circumstances: (1) pursuant to the 'common fund exception' that 'allows a court to award attorney's fees to a party whose litigation efforts directly benefit others[,]' * * *; (2) 'as a sanction for the willful disobedience of a court order[,]' * * *; or (3) when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Id. (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991))."

Additionally, "[e]ven if the provisions of the [r]ules of [c]ivil [p]rocedure that permit the imposition of sanctions for litigation abuses are not strictly applicable here, they may nevertheless be used by analogy to guide our review of the [Superior] [C]ourt's actions." Lett v. Providence Journal Co., 798 A.2d 355, 365 (R.I. 2002) (quoting John's Insulation, Inc. v. L. Addison and Associates, Inc., 156 F.3d 101, 108 (1st Cir. 1998)). Consequently, this Court will review the trial justice's imposition of the sanction based on its inherent powers. See Najarian, 911 A.2d at 711.

## B

### Findings of Sanctionable Conduct

### 1. Doctor Bellafiore

On appeal, Dr. Bellafiore argues that the hearing justice abused his discretion by allocating primary responsibility for the sanctionable conduct to him, and he contends that the judgment must be reversed for several reasons. First, Dr. Bellafiore argues that the alleged "surprise" testimony at trial was contained in his board letter, which he wrote years before trial and provided to WCK as a source of facts to be referenced in the answers to plaintiff's interrogatories. Second, he argues that the trial justice's conclusion that he never described any refusal of treatment prior to the trial is contradicted by the record evidence. Third, he claims that the trial justice unfairly held the pretrial memorandum against him, a document he did not see until after WCK filed it with the court. Fourth, he maintains that the trial justice improperly

- 17 -

sanctioned him for his medical note-keeping practices despite that issue not being before the court. Lastly, he argues that the trial justice's allocation of eighty percent of the sanction to him contradicts the record evidence and lacks principled rationale.

In response to Dr. Bellafiore's arguments, plaintiff argues that the trial justice did not abuse his discretion in imposing a sanction upon Dr. Bellafiore. She argues that the trial justice was in the "best position to fully understand and appreciate the significance of the misconduct, the disruption caused to the legal process, and the need to correct this injustice by deterring repetition and remedying the harm caused." The plaintiff further contends that Dr. Bellafiore's "deliberate and calculated decision to withhold statements he then claimed were made by [Manning] robbed * * * plaintiff and her children of their day in court." The plaintiff insists that it is "impossible to corroborate either version of Dr. Bellafiore's testimony, because his contemporaneous medical records are so lacking in detail" and because neither Dr. NcNiece nor plaintiff's testimony demonstrated that Dr. Bellafiore had the conversation with Manning about sedation and that Manning refused. The plaintiff highlights that "Dr. Bellafiore was in the best position to know if his written answers contained complete and accurate accounts of the medical events surrounding the care of * * * Manning" and that, consequently, he cannot simply assign the blame to his counsel.

After a thorough review of the extensive trial record before this Court, including motions, discovery material, exhibits, and transcripts of both the underlying trial and sanction proceedings, it is this Court's opinion that the trial justice did not overlook or misconceive material evidence in determining that a sanction was appropriate against Dr. Bellafiore. It is important to note at the outset, however, that of the five assertions made by Dr. Bellafiore at trial that the trial justice characterized as "brand new" in his written decision, two of those

assertions—testimony regarding "[c]onversations with * * * Manning about sedations on March 5 or March 6" and testimony that "Manning apologized"—can be found in the deposition transcripts that are part of the record before this Court.[9] Nevertheless, at least three assertions were made in Dr. Bellafiore's trial testimony that had not been made during discovery, including the use of the term "conscious sedation," the discussion of the drug Versed as a possible anesthetic to allow Manning to undergo the closed MRI, and bringing in an anesthesiologist during days 2 and 3 of Manning's hospitalization.

The record before this Court is clear that, at a minimum, Dr. Bellafiore failed to answer questions posed in plaintiff's interrogatories and at his deposition completely and that he added significant new details in his testimony at trial. When asked in plaintiff's interrogatories to provide information regarding "the person with whom [he] had each conversation, * * * the time and date of each conversation, * * * [and] the content of each conversation," Dr. Bellafiore attested that "[he] spoke with [Manning] and [Mrs. Manning] during [Manning's] admission regarding his treatment," without specifying the content of those conversations. When asked at deposition what he prescribed to patients in the past who needed to undergo an MRI but were having a claustrophobic reaction, he testified that "[he] use[d] Ativan." He also agreed that, "as of March 7[th] [or day 4]" but not on days 2 or 3, he was prepared to take the risk of trying the closed MRI machine and putting Manning under some kind of sedation or anesthesia in order to get a picture, "[b]ecause on [days 2 and 3] the expectation was that the open MRI, which was the safer test, was going to be available." Doctor Bellafiore, therefore, indicated that he did not

---

[9] Although not set forth in answers to plaintiff's interrogatories, at deposition Dr. Bellafiore testified that he discussed sedation with Manning on both March 5 and 6 and that, on both occasions, Manning declined to undergo an MRI, even with "more sedation." Additionally, Dr. Bellafiore testified at deposition that "[Manning] said he was sorry. He just didn't think he could do [the MRI]."

- 19 -

consider anesthesia or sedation with the assistance of an anesthesiologist as a desirable treatment for Manning prior to day 4 because it would pose too much of a risk in light of the expectation that the open MRI unit would be operational in the near future. He also did not describe any IV or Versed sedation with the help of an anesthesiologist as a possible medication for Manning. Nonetheless, and surprisingly, at trial he testified about offering more Ativan <u>as well as IV sedation</u> or "conscious sedation" with the help of an anesthesiologist on days 2 and 3.

It is evident from the record before this Court that this unexpected testimony came as a bombshell in the middle of the trial.[10] We agree with the trial justice that to reveal or even suggest, so late in the case, that Manning was informed of risks and refused to undergo the MRI even with "conscious sedation," was "simply astonishing." Therefore, the trial justice's conclusion that Dr. Bellafiore "[e]ither * * * hid[] the complete answers, or he opted to modify his version of the truth far into the trial," is supported by the record and is not otherwise clearly wrong.

Furthermore, although the trial justice did not use the terms "bad faith, vexatiously, wantonly, or for oppressive reasons" to describe Dr. Bellafiore's actions, the specific finding that "[e]ither Dr. Bellafiore willfully refused to answer direct questions on the specific issues during

---

[10] The trial justice wrote in his decision: "[T]his unexpected, undisclosed testimony significantly altered the focus of the trial and justified the granting of a new trial. * * * The impact of these new revelations was tremendous. To say that Manning's counsel were blindsided would be an understatement." He further noted that, "[e]ven though the trial was eight years ago, he distinctly recalled the look of astonishment on [p]laintiff's counsel immediately after Dr. Bellafiore's colloquy." The trial justice characterized "the failure to disclose such essential information [as] shocking." The clear thrust of Dr. Bellafiore's testimony during discovery was that on days 2 and 3 he had discussed the possibility of increasing the dosage of Ativan and that he had rejected any anesthesiologist-assisted sedation as too dangerous. Clearly, the options that Dr. Bellafiore had offered to Manning to facilitate the MRI were critical to plaintiff's case. Any conversations concerning the levels of sedation discussed should have been fully disclosed during discovery.

discovery and after court orders, or he provided false testimony," are sufficient to supply these meanings. See Harlan v. Lewis, 982 F.2d 1255, 1260 (8th Cir. 1993) ("[a]lthough the district judge did not use the words 'oppressive, vexatious, or bad faith' to describe [counsel's] action * * * the specific findings of impermissible and unethical conduct are sufficient to supply these meanings"); see also Baker Industries, Inc. v. Cerberus Limited, 764 F.2d 204, 209 (3d Cir. 1985) (declining to remand "for an explicit finding of bad faith when it is clearly evident from the district court's expressions and from the record as a whole, that the district court found, albeit implicitly, * * * conduct to be in bad faith"). The trial justice's findings that Dr. Bellafiore was "motivated by improper purposes and lacking in good faith," "knew his sworn answers were indirect, evasive, significantly incomplete, and had little concern for the result," also supports an inference of a bad-faith finding. Because "[l]ittle is to be gained from requiring semantic improvement when the meaning of the [trial justice] is clear," Harlan, 982 F.2d at 1260, this Court holds that a finding that Dr. Bellafiore acted in bad faith can be inferred by the trial justice's decision and that such decision did not overlook or misconceive material evidence, and is not otherwise clearly wrong. Consequently, it is our opinion that the trial justice did not abuse his discretion in finding that Dr. Bellafiore engaged in sanctionable conduct.

### 2. Attorney White and WCK

WCK argues that the trial justice committed reversible error and abused his discretion when he sanctioned counsel for the disjunction between Dr. Bellafiore's pretrial disclosures and his testimony at trial. WCK argues that the trial justice's twenty percent apportionment of responsibility to WCK for the surprise testimony was not predicated on any finding of willful misconduct by counsel. WCK contests that the trial justice made counsel the guarantor of complete and truthful answers from Dr. Bellafiore. WCK insists that, because Dr. Bellafiore

- 21 -

conceded that he never discussed offering anesthesia-assisted conscious sedation with WCK, it "should not be penalized for the failure to disclose a conversation that [Dr. Bellafiore] had kept to himself until trial and that may never have taken place at all."

In response, plaintiff argues that White became aware when he read the board letter as to the central issue regarding the MRI and sedation, but failed to disclose this critical information when he drafted the answers to the interrogatories. Because this information would constitute a "complete defense"—that Manning refused treatment—plaintiff argues that the trial justice properly found that the obligation to disclose this defense rested with both defendant and his counsel, White.

After a careful review of the record before this Court and the trial justice's decision, it is our opinion that, unlike the findings of fact related to Dr. Bellafiore's conduct, the trial justice made no findings of fact regarding White's conduct that would support an inference that White acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." See Najarian, 911 A.2d at 711 n.5. To the contrary, the trial justice concluded that Dr. Bellafiore's testimony at the sanction hearing "did not lead the [trial] [c]ourt to surmise that counsel masterminded the entire shell game," and that "[t]here was no showing that [White] knew that Dr. Bellafiore had such a detailed recollection of the specific events of the key conversation * * *." Although the trial justice found that White "failed to include the reference to maximum sedation in Dr. Bellafiore's interrogatory answers" despite having the board letter in hand, that "Dr. Bellafiore and his counsel * * * had a duty to disclose facts, when asked," and that "[c]ounsel knew, or should have

known, of this clear obligation," this does not support an inference of bad faith, rather it sounds in negligence.[11]

Consequently, this Court vacates the judgment against WCK because the trial justice did not make a finding, nor can one be inferred, that the attorneys at WCK acted in "bad faith, vexatiously, wantonly, or for oppressive reasons" as necessary when relying on the court's inherent powers to impose a sanction.[12]

## C

## Monetary Sanction Imposed

Because we hold that Dr. Bellafiore alone engaged in sanctionable conduct, he is necessarily accountable for one-hundred percent of the sanction.[13]   However, this Court is troubled by the total amount imposed—$152,998.57.  Although we afford a trial justice wide latitude to fashion an appropriate remedy for sanctionable conduct, Carrasco, 918 A.2d at 217, we are of the opinion that in this case the trial justice based his calculations on an erroneous assessment of the evidence. See In re Briggs, 62 A.3d 1090, 1098-99 (R.I. 2013).

---

[11] We shall note, however, that had there been a finding that WCK acted in bad faith because White and/or Carlin knew that Dr. Bellafiore was providing false testimony, then the attorneys would be in violation of Article V, Rule 3.3 of the Supreme Court Rules of Professional Conduct. See Rule 3.3(a)(3) ("A lawyer shall not knowingly * * * offer evidence that the lawyer knows to be false."); See Rule 3.3(a)(3) Editor's Comments 8 ("The prohibition against offering false evidence only applies if the lawyer knows that the evidence is false.  A lawyer's reasonable belief that evidence is false does not preclude its presentation to the trier of fact.").

[12] We are concerned, however, with counsel's obligations of candor to the court in light of his client's testimony.  White testified at the sanction hearing that, after he heard Dr. Bellafiore's startling new testimony, he said to co-counsel, "where the f did this come from."  Yet armed with the knowledge that his client's testimony was significantly at odds with his revelations during discovery, White neither advised the trial justice nor moved to withdraw.  The trial justice, however, did not address this thorny intersection of counsel's duty to his client and his duty to the court, and neither shall we.

[13] As previously noted, the trial justice originally apportioned eighty percent of the sanction to Dr. Bellafiore, and twenty percent to WCK.

- 23 -

We disagree with the trial justice's contention that much of the time, effort, money and dedication to the first trial was "for naught" due to Dr. Bellafiore's sanctionable conduct. This characterization of the first trial disregards the fact that plaintiff tried several claims against two other defendants—Dr. McNiece and SCH.[14] Although the trial justice attempted to exclude portions of the trial that were related exclusively to the claims against these defendants when calculating the amount of fees he would impose, the ultimate sanction he imposed even exceeded plaintiff's requested amount by over $30,000.[15]

Additionally, although Dr. Bellafiore's surprise testimony came on February 2, 2004, the trial continued for several more days before plaintiff filed her motion for entry of default judgment against Dr. Bellafiore or in the alternative to exclude Dr. Bellafiore's testimony. At that time, the trial justice reserved ruling on the motion, reasoning that "sometimes the greatest penalty for a witness who has been inconsistent or misleading is that the jury won't believe him or her." Notably, after the jury rendered its verdict in favor of Dr. Bellafiore and the trial justice granted plaintiff's motion for a new trial, he did so in part based upon his determination that Dr. Bellafiore's testimony "best support[ed] the proposition that he failed to meet the standard of care." Clearly, the differences in Dr. Bellafiore's pretrial disclosures and trial testimony were not the exclusive reason the trial justice granted plaintiff's motion for a new trial.

---

[14] The trial justice held that "[t]he Mannings' case against Dr. McNeice [sic] and [SCH] was submitted without incident" and because plaintiff did not claim any residual effect on her case against these defendants, the court declined to "infer any fallout."

[15] In plaintiff's amended costs and fees in support of renewed motion for sanctions, she sought a sum of $121,353.41 to be imposed as a sanction. Moreover, although the trial justice recognized in his decision that plaintiff had suggested that the sanction compensate "only one of their attorneys at trial," he nevertheless allowed plaintiff compensation for one attorney at one-hundred percent and a second attorney at fifty percent. In addition, the trial justice acknowledged that, although plaintiff "further suggest[ed] that the bill be reduced by one-half as there were two other [d]efendants at trial," the trial justice declined to do so. Ultimately, plaintiff sought to be compensated for 99 hours of trial work, but the trial justice included 325.5 trial hours in calculating the sanction.

It is our opinion, therefore, that Dr. Bellafiore should not have to bear so much of the costs associated with the first trial. This is especially true where the case did not result in a second trial and the parties reached a settlement. Although the parties' settlement explicitly preserved the issue of sanctions, the fact that plaintiff did not incur the additional costs of a second trial is relevant to determining what amount Dr. Bellafiore should be sanctioned. While Rule 11 is not strictly applicable here, the purpose behind its sanctions—"to deter repetition of the harm, and to remedy the harm caused"—can nevertheless guide our review of the sanction imposed in this case. Lett, 798 A.2d at 368. The harm caused to plaintiff was reduced when plaintiff reached a settlement agreement with Dr. Bellafiore and did not have to try the case again. Thus, to "remedy the harm" does not require us to ignore this fact. Additionally, a jury verdict in defendant's favor was vacated and a new trial was ordered. Undoubtedly, this alone would likely deter any party from failing to make proper pretrial disclosures or from altering their testimony at trial. Doctor Bellafiore too was back to square one.

We are therefore satisfied that the trial justice's imposition of such a hefty sanction is unsustainable. Accordingly, this Court vacates the order sanctioning Dr. Bellafiore and WCK in the amount of $152,998.57 and directs the Superior Court to enter an order sanctioning Dr. Bellafiore in the amount of $38,398.53. This sum represents the trial expenses awarded by the trial justice; it does not include, however, the attorneys' fees awarded by the trial justice.[16] The plaintiff's claims against Dr. McNiece and SCH were fully and finally, albeit unsuccessfully, litigated in that trial. Additionally, this Court specifically excludes the 25 hours (or 33.5 hours)[17] of attorneys' fees associated with the sanction hearing that were imposed. As noted, the sanction

---

[16] The trial justice specifically excluded expenses that were incurred in support of plaintiff's claims against Dr. McNiece and SCH, as well as the costs of preparing exhibits that were "reusable."

[17] See footnote No. 7.

- 25 -

imposed on Dr. Bellafiore must be a consequence of instances where the trial justice found he "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Najarian, 911 A.2d at 711 n.5 (quoting Chambers, 501 U.S. at 45-46). Although the trial justice made such findings as it related to the differences in Dr. Bellafiore's pretrial disclosures and trial testimony—the trial justice did not make a bad-faith finding as it related to Dr. Bellafiore's conduct during the sanction proceedings. In our opinion, to include in Dr. Bellafiore's monetary sanction the amount of attorneys' fees incurred by the plaintiff to press the issue of the sanction would be inappropriate. In essence, the court would be sanctioning Dr. Bellafiore for defending against a motion to impose a sanction on him, rather than for any sanctionable conduct. Consequently, we direct the Superior Court to enter an order sanctioning Dr. Bellafiore in the amount of $38,398.53.

## IV

### Conclusion

For the reasons stated herein, we affirm in part and vacate in part the judgment of the Superior Court. The record shall be returned to the Superior Court.

Justice Indeglia did not participate.

**Justice Robinson, concurring in part and dissenting in part.** I am pleased to be able to concur in the Court's opinion to the extent that it vacates the very substantial monetary sanction which the trial court imposed on White & Kelly, P.C.[1] However, I respectfully but

---

[1] I wish to clarify my position with respect to the sanction imposed on the law firm of White & Kelly, P.C. I am of one mind with the majority that no sanction should have been imposed on that professional office—because I do not believe that any sanctionable conduct occurred in this case. However, I take issue with the majority's approach whereby it overturns the sanction against the law firm while simultaneously upholding the sanction against Dr.

most vigorously dissent from the Court's ruling that <u>any</u> monetary sanction (regardless of the amount) was appropriately levied against Doctor Peter J. Bellafiore. It is my very definite view that neither Dr. Bellafiore nor his attorneys engaged in any sanctionable conduct in this case.

I am well aware of the stresses and strains that are inherent in all litigation, and I am equally aware of how the occurrence of unanticipated testimony or other unexpected evidence can necessitate major adjustments in trial strategy and tactics in mid-stream; and I am not a naif who refuses to believe that sharp practices sometimes take place during discovery or in the courtroom, <u>but</u> <u>this</u> <u>is</u> <u>no</u> <u>such</u> <u>case</u>. After carefully scrutinizing the record, I simply do not see therein conduct of a sanctionable nature on the part of Dr. Bellafiore; I fail to see in the record the presence of anything more than "the fog of war" that so often envelops litigation—especially in the midst of a high-stakes jury trial.

**I**

I acknowledge that this Court must abide by an abuse of discretion standard of review in the instant case and must determine whether or not the sanction at issue was imposed based on a clearly erroneous assessment of the evidence. <u>Pleasant Management, LLC v. Carrasco</u>, 918 A.2d 213, 217 (R.I. 2007). However, what the majority fails to take into consideration in conducting its review is the fact that the discretion of which we speak "is not exercised by merely granting or denying a party's request;" rather, "[t]he term 'discretion' imports action taken in the light of reason as applied to all the facts and with a view to the rights of all the parties to the action while having regard for what is right and equitable under the circumstances and the law." <u>Hartman v. Carter</u>, 121 R.I. 1, 5, 393 A.2d 1102, 1105 (1978); <u>see</u> <u>also</u> <u>Dauray v. Mee</u>, 109 A.3d 832, 846 (R.I. 2015); <u>State v. Lead Industries Association, Inc.</u>, 69 A.3d 1304, 1312 (R.I. 2013).

Bellafiore. In my judgment, if it was appropriate to sanction Dr. Bellafiore, then his counsel should have been sanctioned as well.

I am profoundly disturbed by the fact that, of the five alleged inconsistencies between Dr. Bellafiore's discovery disclosures and his trial testimony on which the trial justice's sanction decision is based, two are clearly in error. My concern is deepened by the fact that it is readily apparent from a reading of the deposition testimony and answers to interrogatories at issue that the trial justice was simply not correct with respect to those two bases—i.e., whether or not Dr. Bellafiore stated during discovery that Mr. Manning apologized and whether or not conversations with Mr. Manning about sedation on March 5 or March 6 had been referenced by Dr. Bellafiore during discovery.[2]

Moreover, a detailed reading of the deposition testimony shows that a third basis relied upon by the trial justice as a predicate for the sanction, while not incorrect, is not in fact as clear an inconsistency as the trial justice implies. The trial justice stated that "[t]he drug, Versed, was never identified earlier." He is correct that Dr. Bellafiore never used the word "Versed" at his deposition or in his answers to interrogatories. However, the following colloquy took place at Dr. Bellafiore's deposition:

> "Q.   Do you know now what options they have for sedation at
>        the closed machine [at Rhode Island Hospital]?
> "A.   I would assume it's the same options that we have at our
>        hospital.
> "Q.   What are those options?
> "A.   There are a variety of things you can do including Ativan
>        or other benzodiazepines * * *." (Emphasis added.)

---

[2]   The majority opinion candidly acknowledges the flawed nature of the trial justice's decision. Regrettably, however, the majority opinion makes such acknowledgment only briefly and then moves on without giving meaningful consideration to just how greatly fact-finding errors of the magnitude present in the instant case call into doubt the dependability of the entirety of the trial justice's decision, including his ultimate conclusion.

In what is a marked characteristic of the deposition, no follow-up question was asked relative to Dr. Bellafiore's reference to "other benzodiazepines." A brief look at the Physicians' Desk Reference shows that Versed <u>is</u> a benzodiazepine.[3] Therefore, although Dr. Bellafiore did not use the word "Versed," he clearly stated at his deposition that, in addition to Ativan, drugs which fall into the class of benzodiazepines, as Versed does, could be used to sedate a patient for a closed MRI.

In addition to the errors committed by the trial justice concerning what he deemed to be multiple bases for imposing sanctions, his decision contains other errors. As the majority recognizes, there are numerous computational errors in the trial justice's calculation of the amount to be awarded as a sanction, as well as inconsistencies between what was "award[ed]" and what was ultimately included in the sanctions amount. And there is more; in addition to these factual errors, the trial justice plainly applied the wrong rule. The text of Rule 11 of the Superior Court Rules of Civil Procedure and our decision in <u>D'Amario v. State</u>, 686 A.2d 82, 85 (R.I. 1996), are very clear: Rule 11 is not applicable to an alleged failure to provide complete answers to interrogatories and deposition questions.

Moreover, my review of the record has uncovered the following additional errors. The trial justice stated in his written decision that plaintiffs' counsel "sought prompt relief" after Dr. Bellafiore's purported "surprise testimony" at trial; however, in reality it took plaintiffs' counsel over a week to move for entry of default. The trial justice also stated in his decision that "Dr. Bellafiore's interrogatory answers describe no refusal of treatment," whereas the supplemental answer to Interrogatory No. 16 stated:

---

[3]     <u>See</u> Midazolam Hydrochloride Injection, The Physicians' Desk Reference, http://www.pdr.net/drug-summary/Midazolam-Hydrochloride-Injection-midazolam-hydrochloride-985 (last visited June 3, 2016) (Versed and Midazolam are the same medication; they simply have different brand names).

> "Defendant asserts that Mr. Manning refused to be sedated to undergo a 'closed' MRI, when the 'open' MRI at Rhode Island Hospital was inoperable, despite being repeatedly informed that he might have a life threatening condition, which might be detectable by MRI."

Additionally, the trial justice stated in his decision that "there is no reference [in Dr. Bellafiore's interrogatory answers] to conversations with Mr. Manning or Mrs. Manning," whereas the answer to Interrogatory No. 18 stated: "I spoke with the patient and his wife during his admission regarding his treatment." In like manner, the trial justice's decision contained the following statement: "To reveal or even suggest, so late in the case [(i.e., at trial)], that Mr. Manning was informed of risks and refused treatment, was simply astonishing." Not only was that information contained in the above-quoted supplemental answer to Interrogatory No. 16, it was also contained in Dr. Bellafiore's deposition testimony; when Dr. Bellafiore was asked at deposition if it was his testimony that Mr. Manning "refused to attempt [the closed MRI] after [he] told [Mr. Manning] that he had a life threatening condition * * *," Dr. Bellafiore responded: "Absolutely."

The numerous material errors contained in the trial justice's written decision addressing the issue of sanctions certainly do not reflect that he exercised his discretion "in the light of reason as applied to all the facts;" it is my opinion that he could not have done so when he was under such a misapprehension with respect to what the facts actually were in the case before him. Hartman, 121 R.I. at 5, 393 A.2d at 1105. When a judge is considering the imposition of any sanction and perhaps especially one of the magnitude of the one at issue in this case—which I note is a very high sanction—he or she should be punctilious about conducting an accurate and meticulous review of the facts and applying with care the correct principles of law. I am unable to say that the trial justice acted in that manner in this case; and, therefore, it is my opinion that

the trial justice in this case abused his discretion when he imposed sanctions on Dr. Bellafiore based to a substantial extent on a clearly erroneous assessment of the facts. See Pleasant Management, LLC, 918 A.2d at 217. The majority's decision to the contrary is, quite frankly, astonishing to me.

## II

My conclusion that the trial justice abused his discretion in the instant case is further buttressed by the fact that, after a thorough review of Dr. Bellafiore's deposition, his entire trial testimony, the answers to interrogatories, and the supplemental answer to interrogatories, I am left with the inescapable conclusion that the trial justice's decision that sanctions were appropriate was not a reasonable determination based on the circumstances present in this case.

The majority correctly reviews the trial justice's decision based on his inherent power to sanction. Such a sanction allows a trial justice to exercise that inherent power "to fashion an appropriate remedy that would serve the ends of justice." Vincent v. Musone, 574 A.2d 1234, 1235 (R.I. 1990). As the majority recognizes, the trial court may properly exercise its inherent power to impose a sanction on a party only upon a finding that the party (in this case, Dr. Bellafiore) "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991) (internal quotation marks omitted); see Blue Cross & Blue Shield of Rhode Island v. Najarian, 911 A.2d 706, 711 n.5 (R.I. 2006). After a thorough and painstaking review of the record in its entirety, I am genuinely mystified as to how the majority could come to the determination that somehow Dr. Bellafiore's conduct met that standard.

I begin by considering the standard itself. As I noted in my recent dissent in Long v. Dell, Inc., 93 A.3d 988, 1007 n.1 (R.I. 2014), "this Court has on numerous occasions, in past

opinions, relied on dictionary definitions to provide the plain meaning of certain words."[4]  As such, in the instant case I deem it necessary to look to the dictionary definitions of bad faith, vexatious, wanton, and oppressive.  Bad faith has been defined as "[d]ishonesty of belief, purpose, or motive," Black's Law Dictionary 166 (10th ed. 2014), and as "[t]he malicious intention to be dishonest or to violate the law, as in negotiations over a contract."  The American Heritage Dictionary of the English Language 133 (5th ed. 2011).  Vexatious has been defined as "without reasonable or probable cause or excuse; harassing; annoying," and vexation has been defined as "[t]he damage that results from trickery or malice."  Black's Law Dictionary at 1796.  In addition, wanton means "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences," id. at 1815, and "[m]arked by unprovoked, gratuitous maliciousness; capricious and unjust[.]"  The American Heritage Dictionary of the English Language at 1951.  Oppressive is defined as "exercising power arbitrarily and often unjustly; tyrannical" and "[d]ifficult to cope with; causing hardship or depressed spirits."  Id. at 1237.  These definitions show that a sanction based on the court's inherent power should be a reaction to conduct that could be characterized as malicious, dishonest, harassing, or unjust.

To determine whether Dr. Bellafiore's conduct in this case rose to that very high standard, I look to what transpired during the discovery process.  Although unquestionably Dr. Bellafiore's answers to Interrogatories No. 7 and 18 were terse and incomplete (although they were not inaccurate), it is in my view highly significant that no motion to compel more

---

[4]    See, e.g., Olamuyiwa v. Zebra Atlantek, Inc., 45 A.3d 527, 535 (R.I. 2012) ("It is well established that [w]hen * * * a statute does not define a word, courts will often apply a common meaning as provided by a recognized dictionary.") (internal quotation marks omitted); Drs. Pass and Bertherman, Inc. v. Neighborhood Health Plan of Rhode Island, 31 A.3d 1263, 1269 (R.I. 2011) ("This meaning is consistent with the common sense, dictionary definition of 'public' with respect to expenditures."); In re Proposed Town of New Shoreham Project, 25 A.3d 482, 513 (R.I. 2011) ("When, as is the case here, a statute does not define a word, courts will often apply a common meaning as provided by a recognized dictionary.") (internal quotation marks omitted).

responsive answers was filed with respect to those answers. Nor were Requests for Admission employed for the purpose of "pinning down" crucial facts. Moreover, no motion to compel a more responsive answer was filed after Dr. Bellafiore provided his supplemental answer to Interrogatory No. 16 which, crucially, stated: "Defendant asserts that Mr. Manning refused to be sedated to undergo a 'closed' MRI, when the 'open' MRI at Rhode Island Hospital was inoperable * * *." I take no joy in serving as a Monday morning quarterback with respect to the conduct of litigation. Nevertheless, where very significant sanctions are at issue, as they are in the instant case, I feel obliged to state that this case would probably not be before us if plaintiffs' counsel had been more meticulous in the course of the discovery process.

When I turn to Dr. Bellafiore's deposition, the lack of meticulousness on the part of plaintiffs' counsel is even more readily apparent. The plaintiffs' counsel, in posing questions at the deposition, repeatedly used simply the word "sedation" or "anesthesia" without specifying what level of sedation the question was referencing. For example, Dr. Bellafiore was asked for "any reason why [Mr.] Manning couldn't have been sedated with the assistance of anesthesiology," and he was asked "[H]ow does that change the fact that sedation or anesthesia pose[d] a risk of death to your patient?" In addition, references were made to "more sedation," "some kind of sedation or anesthesia," and "some anesthesia." Those questions and references are simply a few examples of a multitude of instances where the term sedation was used but not defined by plaintiffs' counsel at deposition. At one point in the deposition, Dr. Bellafiore was asked a question regarding "mild sedation," to which he responded: "Well, what's the definition of mild sedation?" No attempt was made by plaintiffs' counsel to define mild sedation before moving on to another topic. That seems to have been the trend at Dr. Bellafiore's deposition: when he would reply to a question in a somewhat general manner, there was a frequent

noteworthy failure to follow-up or ask more specific questions. The deposition afforded plaintiffs' counsel the opportunity to probe beneath the surface in order to make Dr. Bellafiore's position specific and clear, but counsel failed to avail herself of that opportunity.

The distinctions between giving a sedative, conscious sedation, and general anesthesia, which were so extensively examined at trial, are noticeably absent from the deposition questions. That fact is especially curious in view of the fact that Dr. Bellafiore's answer to plaintiffs' complaint contained an affirmative defense of assumption of the risk as well as an explicit statement that Dr. Bellafiore was asserting "all applicable defenses relating to comparative negligence and contributory negligence;" those statements should have put plaintiffs and their counsel on notice that how much sedation was offered, when it was offered, and when it was refused by Mr. Manning would be of paramount importance in this case. Nonetheless, plaintiffs' counsel opted, for whatever reason, not to depart from generalities with respect to levels of sedation, and she made no attempt to clarify what each party's understanding of those general terms were.

The confusion over the specifics of sedation and anesthesia was readily apparent at trial. On the second day of questioning, Dr. Bellafiore responded as follows to a question posed by plaintiffs' counsel: "Now, you need to define anesthesia, conscious sedation for me, because I'm not sure what we are talking about." Moreover, after finally and at length arriving at a definition of conscious sedation and delineating three levels or types of sedation, an exchange such as the following still took place:

> "Q. And we can agree that sedation short of general anesthesia is conscious sedation?
> "A. No, I can't agree to that because I don't know what you mean by that. I mean, I asked you to define the terms. And when you say 'short of general anesthesia,' I don't know if

that's conscious sedation. I don't know if that's -- I don't
know what that is."

Additionally, during Dr. Bellafiore's trial testimony, when plaintiffs' counsel was questioning him with respect to his lack of testimony about conscious sedation at his deposition, defense counsel was required to raise the following very significant objection: "I object, your Honor * * * [The plaintiffs' counsel] spent 45 minutes trying to define and write on the chart [the various levels of sedation] versus what was done at deposition. There was no definition done [at deposition]. There was no distinction between the three at deposition."

Despite the nature of the deposition questions, plaintiffs' counsel implied at trial that Dr. Bellafiore had been untruthful in not providing more specific, detailed answers to the deposition questions and in not clarifying what he meant by sedation. Those implications are rampant in the examination of Dr. Bellafiore at trial, and he repeatedly had to explain that he "tried to answer the questions as clear as [plaintiffs' counsel] asked [him]. [He] tried to answer exactly the question [he] was asked." In addition to the implications by plaintiffs' counsel, the trial justice stated in his decision that Dr. Bellafiore should have recognized that informed consent was "very much in issue" and should have disclosed related facts "when asked" during discovery. However, it is absolutely crucial to note that, contrary to the trial justice's assertion, Dr. Bellafiore did answer the questions that were put to him; it is not, nor has it ever been in our system, the responsibility of a deponent to provide information that he or she is not asked for at a deposition. The fact that the questions asked at the deposition did not provide the information which plaintiffs would have found useful at trial is the fault of the questioner, not the deponent; certainly the deponent should not be penalized for the failure of the questioner to have asked more searching questions at the deposition. In seeming disregard of these record-based considerations, the majority opinion still holds that Dr. Bellafiore's actions somehow satisfy the

very high standard applicable to sanctions levied under the inherent power of the court. But such a holding is puzzling after one conducts a full review of the record and thereby comes to realize the depth of confusion which existed in this case with respect to how to define and delineate levels of sedation.

The trial justice pointed out, as one of his five bases for sanctioning Dr. Bellafiore, that Dr. Bellafiore did not use the term "conscious sedation" during discovery. What the trial justice did not address, however, is the fact that neither did counsel for plaintiffs. Moreover, it is not only Dr. Bellafiore who began using the term "conscious sedation" at trial; the same is true for plaintiffs' counsel. I note additionally that any prejudice purportedly suffered by plaintiffs in this case was surely mitigated by the extensive examination of Dr. Bellafiore at trial regarding every supposed inconsistency with his deposition testimony. We expressly acknowledged in our opinion in Manning v. Bellafiore, M.D., 991 A.2d 399, 404 (R.I. 2010), that the plaintiffs, at trial, "vigorously disputed Dr. Bellafiore's contention that he had frequently offered Mr. Manning conscious sedation as a means of completing the MRI/MRA examination and repeatedly pointed out that, in both his answers to interrogatories and his deposition testimony, Dr. Bellafiore had failed to mention offering this option." Therefore, whatever inconsistency there may have been was already before the jury, whose members were free to assess how those inconsistencies might affect Dr. Bellafiore's credibility. See State v. Richardson, 47 A.3d 305, 314 (R.I. 2012) ("It is axiomatic that [t]he determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury.") (internal quotation marks omitted). Moreover, it is telling that, despite the assertion by the majority that Dr. Bellafiore's testimony at trial was some sort of "bombshell," it took plaintiffs' counsel over a week to move for entry of default.

In conclusion, when one looks at the entirety of the deposition testimony, Dr. Bellafiore's trial testimony, and his answers to interrogatories, rather than myopically looking at only the purported inconsistencies perceived by the trial justice, it is obvious that Dr. Bellafiore was not acting with malice, unjustly, in a harassing manner, or dishonestly; Dr. Bellafiore did not lie during the discovery process, and there is no evidence of an intent to evade, contrary to the trial justice's rather hyperbolic characterizations.[5]  In addition, my careful perusal of the portions of Dr. Bellafiore's deposition testimony that are quoted in the majority opinion and my reading of the remainder of his deposition testimony, have completely failed to convince me that there was any evasiveness or "hidden ball" behavior on the part of the deponent.  Doctor Bellafiore's deposition answers and his answers to interrogatories are arguably lacking in optimal specificity, but it is clear to me that any inconsistencies which resulted were at best the product of negligence.  I have been unable to perceive any evidence in the record tending to show that Dr. Bellafiore's actions could be characterized as having been taken in bad faith, wantonly, vexatiously, or for oppressive reasons.  During the course of the adversarial interaction that is the essence of the litigation process, it is not uncommon for there to be answers which lack specificity or for there to be some degree of inconsistency between deposition and trial testimony; that is not in and of itself a valid basis for sanctions.  I simply cannot in good conscience concur in the majority's opinion to the contrary.

---

[5]  In his written decision concerning sanctions, the trial justice used words like "shocking," "jaw-dropping," and "surprise testimony."  He further stated that Dr. Bellafiore "opted to modify his version of the truth" and that plaintiffs' counsel was "blindsided" by Dr. Bellafiore's trial testimony.

## III

Furthermore, my decision to dissent in this case is also driven by the fact that the majority fails to address the ample precedent indicating that a court's inherent power to sanction must be exercised in very limited circumstances and with great restraint. The United States Court of Appeals for the First Circuit has stated that, "even when inherent powers legitimately can be invoked, they must be exercised with restraint and circumspection, both 'because [they] are shielded from direct democratic controls,'" United States v. Horn, 29 F.3d 754, 760 (1st Cir. 1994) (Selya, J.) (quoting Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980)), and "[b]ecause of their very potency[.]" Id. (quoting Chambers, 501 U.S. at 44). The United States Court of Appeals for the Third Circuit has echoed the First Circuit in stating that "'[b]ecause of their very potency' * * * the federal courts must be careful to exercise their inherent powers 'with restraint and discretion.'" Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc., 57 F.3d 1215, 1224 (3d Cir. 1995) (quoting Chambers, 501 U.S. at 44); accord Natural Gas Pipeline Co. of America v. Energy Gathering, Inc., 86 F.3d 464, 467 (5th Cir. 1996); 61A Am. Jur. 2d Pleadings § 601 at 609 (2010).

Moreover, a court should use its power to sanction only "if to do so is essential to preserve the authority of the court" and may do so only after "[c]areful analysis and discrete findings." 61A Am. Jur. 2d Pleadings § 605 at 615; cf. Huntley v. State, 109 A.3d 869, 875 (R.I. 2015) (holding that there was no abuse of discretion in an award of Rule 11 sanctions "given that the hearing justice carefully reviewed the record" before issuing the sanctions). The sanction which is chosen by the imposing court "must employ the least possible power adequate to the end proposed" and "[i]f there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first." Natural Gas Pipeline Co., 86

F.3d at 467 (internal quotation marks omitted); see Spallone v. United States, 493 U.S. 265, 280 (1990) (stating that "a court must exercise [t]he least possible power adequate to the end proposed") (internal quotation marks omitted); cf. Huntley, 109 A.3d at 873 (stating, in the context of Rule 11 sanctions, that the trial justice's chosen remedy should take into account the "purpose of the rule: to deter repetition of the harm, and to remedy the harm caused") (internal quotation marks omitted).

The above-referenced principles indicate that the inherent power to sanction should be used only in the most limited circumstances. I can conceive of no interpretation of the record that would result in the conclusion that such circumstances are present in the instant case, nor does the majority attempt to show that such circumstances are present. With all due respect for the trial justice, I am unable to say that he acted in this case on the basis of a careful analysis and discrete findings given that the sanctions decision contains numerous material errors. See 61A Am. Jur. 2d Pleadings § 605 at 615. I fail to understand how the trial justice could have concluded that he was acting within his discretion and with the required restraint when he imposed such a massive fine on a layperson—an individual who, by definition, does not have the same familiarity with the legal system and the rules of discovery as an attorney. The trial justice appears not to have given sufficient weight to the fact that human memory is a notoriously fallible instrument. Doctor Bellafiore's testimony, both at deposition and at trial, was based on his memory of the events surrounding Mr. Manning's treatment. At the time of the deposition, it had been over three years since those events occurred; and, by the time of trial, it had been approximately seven years since their occurrence. In my judgment, it is not reasonable for the trial justice and the majority to expect a layperson's memory of events to be exactly the same three years and seven years after the events in question.

In my opinion, if any inconsistencies were present, they were more than adequately dealt with by the granting of plaintiffs' motion for a new trial. The trial justice should have recognized that he had thereby employed the least amount of power needed for the end he deemed to be appropriate and that no further action was required to preserve the authority of the court. See Natural Gas Pipeline Co., 86 F.3d at 467; 61A Am. Jur. 2d Pleadings § 605 at 615. The granting of plaintiffs' motion for a new trial led to an eventual settlement between plaintiffs and Dr. Bellafiore, and it certainly constituted sanction enough in this case, even if (contrary to my unwavering belief) a sanction was called for.

Litigation is no day at the beach; it is a grueling activity, accompanied by many twists and turns. The lengthy trial in this case surely had its share of such twists and turns. But I am adamant in my conviction that nothing improper occurred during the discovery phase of this case or during the trial. There was simply no basis for the sanction that was imposed. Poorly conducted discovery on behalf of the plaintiffs resulted in confusion mid-trial. I simply do not comprehend why Dr. Bellafiore is being sanctioned for that chain of events. I have set forth with care the reasons why I believe that there should have been no sanction whatsoever. And it is my further belief that, even granting for the sake of argument that the majority is correct in perceiving sanctionable conduct, the sanction, in the amount determined by the majority, is unreasonable in the extreme. I feel very strongly that justice has not been served in this case. Accordingly, while I concur in the majority's opinion with respect to vacating the sanction imposed against White & Kelly, P.C., I am unable to find strong enough terms to express my conviction that the majority errs gravely in upholding any sanction against Dr. Bellafiore. Consequently, with respect, but most forcefully, I hereby record my dissent.


**TITLE OF CASE:**        Kathryn Manning et al. v. Peter J. Bellafiore, M.D., et al.

**CASE NO:**        No. 2013-14-Appeal.
No. 2013-16-Appeal.
(WC 00-63)

**COURT:**        Supreme Court

**DATE OPINION FILED:**        June 24, 2016

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**WRITTEN BY:**        Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**        Washington County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Jeffrey A. Lanphear

**ATTORNEYS ON APPEAL:**

For Plaintiff:   Miriam Weizenbaum, Esq.
Amato A. DeLuca, Esq.
Shad Miller, Esq.
Candace Brown Casey, Esq.

For Defendant:  Lauren E. Jones, Esq.
Eric F. Eisenberg, *Pro Hac Vice*
Adam M. Ramos, Esq.